## C. P. GILL v. THE STATE.

*No. 1403.   Decided December 16th, 1896.*

**1.  Murder—Evidence—Threats—Shoe Tracks.**

On a trial for murder, where the only inculpatory evidence against defendant was that some months before the homicide he had made threats against the deceased; and certain shoe tracks found near the scene of the homicide, there being nothing peculiar about said tracks; and proof of their correspondence with the shoes of defendant being of the most general character, there being no comparison made between the tracks and shoes. Held: The evidence was insufficient to sustain the conviction.

**2.  Same—Corpus Delicti—Proof of.**

To sustain a conviction, it should appear not only that the offense, as charged, has been committed, but there should also be proof tending to establish that the party charged was the person who committed it, or was a participant in its commission, to a degree of certainty greater than a mere probability or strong suspicion. There must be legal and competent evidence pertinently identifying the defendant with the transaction constituting the offense charged against him.

**3.  Same—Evidence—Hearsay.**

On a trial for murder, where it was in evidence that some one threw a brickbat at S. (a son of deceased) at night, the testimony of a witness, that one M. had said (defendant not being present) that defendant threw the brickbat at S., was hearsay and incompetent.

**4.  Conduct of the Trial, when Had Partly Before the District and Partly Before a Special Judge.**

On a trial for murder, where the regular District Judge presided for a day at the trial, and testimony of three witnesses for the State had been introduced, and, the said judge having been taken sick, a special judge was then elected, who presided and conducted the trial to its conclusion; but the defendant's motion for new trial was heard and overruled by the regular District Judge. Held: No error.

**5.  Impeachment of a Witness by Contradictory Statements.**

A witness cannot be impeached by the party introducing him by proving contradictory statements, unless the statements denied were injurious to the party introducing the witness. A mere failure to make certain proof will not warrant this.

APPEAL from the District Court of Hopkins.   Tried below before Hon. E. W. TERHUNE.

Appeal from a conviction for murder in the second degree; penalty, five years' imprisonment in the penitentiary.

Appellant was indicted in the District Court of Rains County for the murder of Martha Skipwith, on the 20th day of September, 1895, by shooting her with a gun. The venue was changed to the county of Hopkins by the District Judge of his own motion, because of such

prejudice against defendant that he could not obtain a fair and impartial trial in the county of Rains.

W. M. Lamb was sheriff of Rains County at the time Martha Skipwith was killed, and had been for some years. R. M. Skipwith was his son-in-law, and had been his deputy for about a year at said date. R. M. Skipwith had formerly been city marshal of Emory and section foreman and assistant tie inspector on the M., K. & T. Ry. There had been complaint about an ill will towards Skipwith by numerous persons, whom he had arrested while city marshal and deputy sheriff, and by the tie men.

Appellant was an unmarried man, a butcher, who had lived in Rains County for some years, and had in December, 1894, been arrested by R. M. Skipwith on charge of drunkenness, at which time they had some words. Appellant was related to one J. W. Cox, at whose house he was boarding at the time of the killing.

R. M. Skipwith lived in a two-room house, a little less than three hundred yards south of the public square, in the town of Emory. W. M. Lamb lived about one hundred and fifty yards north of Skipwith, and between him and the square. Skipwith's house had a porch on the north side, and the east end of the house stood toward the public road, which ran north and south—that is, we call the directions of this road north and south, though the road and the square and the houses are none of them set by the compass, this road running a little west of south, and running parallel with the west line of the square, and leaving the square at the southwest corner. J. W. Cox lived about one hundred yards east of the square, on the street running east from the southeast corner, his residence being on the south side of said street. J. D. Sanders lived right across the street in front of said Cox. The street was about fifty feet wide, and the houses were about one hundred feet apart. There was a branch across the road, about one hundred and fifty yards east of Cox's house, running in a southeast direction, and passing under the railroad bridge. There was another branch across the road, which ran by R. M. Skipwith's residence, about one hundred yards south of his house, running in a southeast direction, and these two branches came together about two hundred and fifty yards southeast of Skipwith's residence, and three or four hundred yards southeast of Cox's residence. There was timber along both of these branches, and between them. The land was sandy, and the branches were deep, and there was water in both of them. On the southeast corner of the public square stood the hotel kept by Ballew.

About 8 o'clock at night on the 20th of September, 1895, R. M. Skipwith went out on the front porch, as he calls it, and sat down between the two doors that came out of the house on the porch. His mother, Martha Skipwith, came out very soon after he did. He gave her his chair, and moved nearer the street, leaning against a post of the porch. In about a minute a gun fired. She said she was shot. In ten or twenty seconds another shot was fired, and she fell to the floor. Skipwith saw

the flash of the last gun. He was dressed in dark pants and light shirt; she, in a light waist and dark skirt. The night was dark. When she fell he went to her, and after persons had run to the place from the square, they picked her up and carried her in the house. At the suggestion of Roy Nason, who had come from the hotel, after the shooting, R. M. Skipwith took some hound pups he had, out in the road, and they barked and trailed around some. This was done after Mrs. Skipwith was carried in. , After this, R. M. Skipwith looked where he saw the flash of the gun, and saw some tracks there. Others, who had come from town some time after the .dogs were taken out, discovered tracks about the same point, and fenced them up. Appellant was present and assisted in fencing these tracks. The fence in front of the house was an old-fashioned worm rail fence. The gate going into the house was about thirty feet north of a line extending south.and in the same direction as the north wall of the house. The tracks fenced were about on this line. Martha Skipwith was leaning against the north wall of the house at the time she was shot. When the gun fired, R. M. Skipwith's wife screamed very loud, until she was heard all over the town. W. M. Lamb was the first person who got there, and Roy Nason the second. No discoveries were made that night except the tracks, and some wadding, which fit a No. 12 breech-loading shotgun, and some shot. No arrests were made that night. Sheriff Lamb telegraphed for S. J. Mason, sheriff of Hunt County, that night. . ,

On the next morning, Sheriff Mason arrived early. The tracks were pointed out to him, and he trailed them from a southeast direction through the woods, about two hundred or two hundred and fifty yards, until they struck the branch called Sandy Creek, which runs east of Cox's house. There the.tracks he followed went into the branch, and kept up it under the railroad bridge, to a point nearly opposite and about one hundred yards south of Cox's house. The ground between that point and Cox's house was a garden patch, and was enclosed. In following the tracks, there were places where they could not be found. There was water in the branch, and they had gone through the water. The prosecution claim that the track was made by a No. 3 shoe. This was denied by the defense. Appellant wore a No. 3 shoe. J. W. Ballew measured the track with a weed. The weed was produced in court, and was nine and one-half inches in length, and the notch on it which indicated the length of the heel, showed a length of two and three-eighth inches, and two and one-quarter inches across, and three inches across the ball of the foot. When the matter was under investigation by the grand jury, appellant was asked to put his foot on a piece of paper, and a tracing of it was made by the District Attorney, which was produced in court. This tracing was nine and five-eighth inches long, as shown by one witness, and nine and seven-eighth inches as shown by another, and the widest part of the heel was two and five-sixteenth inches, and the width across the ball of the foot three and one-eighth inches. Another measurement was also made on a thick brown

paper, by cutting with a knife the back of the heel and front of the toe. This was was also made by the District Attorney and produced in court, and showed the length to be nine and three-quarter inches. This weed measure of the track was made by John Ballew the next morning after the, killing. The place where the tracks were fenced up was a loose sandy place, and this witness said he judged the tracks to be about a No. 6, and that there was nothing peculiar about them. Other witnesses judged the track to be, from its appearance, about a No. 7. Appellant wore a No. 3 shoe.

J. W. Cox owned, and had at his house at the time of the killing, a No. 12 breech-loading shotgun. There were a large number of No. 12 breech-loading shotguns proven to be in and about Emory at the time of the killing.

The regular judge, the Hon. E. W. Terhune, presided until the witness, S. J. Mason, who was witness for the State and examined before any of appellant's witnesses were examined, had completed his testimony, and was then absent until the motion for new trial was presented, when he appeared and acted on the motion for a new trial, over the objections of appellant. The Hon. W. P. Leach, special judge, had presided during the entire time that defendant's testimony was presented, and had charged the jury. Appellant objected to the regular judge passing upon the motion for new trial, and requested that the said W. P. Leach pass upon the same. In explaining the bill of exceptions, the regular judge says: "On yesterday, in accordance with previous notice, I came back to court, and resumed my seat on the bench, and told counsel I would leave the court at noon today, when they could re-elect Mr. Leach and let him sit on the motion, if desired. Signed, E. W. Terhune, Judge."

*E. B. Perkins, B. M. McMahon, and King & Conor*, for appellant. —The court erred in permitting the State to contradict the witness, H. T. Proctor, by the witness, W. D. Peeples, as to what he had testified before the grand jury, about what Mrs. J. W. Cox had said to him.

The State cannot contradict its own witness, and cannot contradict any witness upon an immaterial issue.

The State introduced H. T. Proctor as a witness, and asked him if he did not inquire of Mrs. J. W. Cox for a shot gun, after the killing of Mrs. Skipwith; he said he did not. The State then asked him if he did not so swear before the grand jury at the time the case was investigated, and if he did not further swear that Mrs. Cox told him she did not know where the gun was—to which the witness answered that he did not so testify. Then the State called W. D. Peeples, and, over objection of appellant, proved by him that said Proctor did so testify before the grand jury. Art. 384, Code Crim. Proc.; Clanton's case, 13 Tex. Crim. App., 153; Thompson's case, 19 Tex. Crim. App., 617.

The court erred in permitting the State to prove by the witness, J. W. Quarles, on cross-examination, that a man told him who threw the

brick at R. M. Skipwith.    The man's name was Sid Martin, and he said that Claude Hill, defendant, threw the brick.

Declarations of third persons are not admissible, unless they come within the rule of res gestæ.

The State, over the objection of appellant, proved by the witness, J. W. Quarles, on examination, the facts mentioned in the above error. The special judge approving the bill of exceptions explains that the proof was admitted because the witness had testified, on direct examination, that he had heard from Sid Martin, who threw the brick.    We fail to understand by what rule of law this would make a declaration (clearly hearsay) admissible.    Harris' case, 1 Tex. Crim. App., 74; Belverman's case, 16 Texas, 130; Felder's case, 23 Tex. Crim. App., 477.

The court erred in the ruling on motion for new trial, in this, that the Hon. E. W. Terhune, regular judge, had not heard any of the witnesses testify for the defendant, and could not therefore pass upon the motion for a new trial, which he did, and overruled the same.

We submit that when the regular judge resumed the seat on the bench, the position of the special judge was vacated, and under the law, all the attorneys in attendance would have a right to vote on what special judge should be re-elected, and the regular judge had no right to assume that Mr. Leach could be re-elected, and in fact he was not.    This question was raised in motion for new trial, in paragraphs 4, 5 and 6.    Article 777, Code Crim. Proc., provides that new trial shall be granted where the verdict is contrary to the law and evidence.    It has always been held that the court who tried the cause must pass upon the sufficiency of the evidence, if that question is raised in the motion for new trial.    See, Loza's case, 1 Tex. Crim. App., 488; Tollett's case, 44 Texas, 95; Gazley's case, 17 Tex. Crim. App., 267; Hernandez' case, 20 Tex. Crim. App., 151.

*Mann Trice*, Assistant Attorney-General, for the State.—As tending to show notice, it was competent to prove who threw a brickbat at Skipwith, especially when it is shown that bad blood existed between appellant's family and Skipwith.

The trial judge after opening the trial, and before the testimony of the State was concluded, took sick and a special judge was selected to try the balance of the case, after which the jury received his charge and returned their verdict.    Under such circumstances this procedure seems to be allowable.    See, 1 Thompson on Trials, § 213 et seq.; State v. Womack, 17 Texas, 237; Edwards v. James, 13 Texas, 52; Cole v. Thompson, 27 S. W. Rep., 46; G., H. & S. A. Ry. Co. v. Crawford, 29 S. W. Rep., 958.

Before the motion for a new trial was acted upon, the regular judge assumed his duties on the bench.    When the motion for a new trial was called before him, defendant objected to the regular District Judge passing upon such motion, because during the progress of the trial, said judge vacated the bench, and the special judge was elected.

The trial court's explanation to this bill shows that on the day previous to presenting the motion for a new trial, he resumed his duties on the bench, and when the motion for new trial was called, he told counsel he would leave the court at noon, when they could re-elect Mr. Leach, the special judge, and have him act on the motion for a new trial, if they desired. They did not avail themselves of this proposition, and by their action in the premises, clearly waived their right—and should not now be heard to complain.

HENDERSON, JUDGE.—Appellant was indicted for the murder of Martha Skipwith. The homicide occurred in Rains County, and the venue of the case was transferred to Hopkins County. The jury convicted appellant of murder in the second degree, assessing the punishment at five years' imprisonment in the penitentiary. Hence this appeal. It appears from the record that on the night of September 20th, R. M. Skipwith and his mother, Martha Skipwith, were sitting on the gallery in front of the house of R. M. Skipwith. The house fronted north. The street ran by the east end of the house. Some one who stood about forty-one feet to the east from where Martha Skipwith, deceased, was sitting in a chair, with a double-barreled shotgun shot and killed the deceased. R. M. Skipwith was sitting about three or four feet from his mother when she was shot. The State's theory is that the assassin, when he fired and killed Mrs. Skipwith, intended to kill her son, R. M. Skipwith. Whether he did so intend, or not, this was a fiendish act, and a cold-blooded assassination; and it is incomprehensible to us how an honest jury, if they believed appellant guilty beyond a reasonable doubt, could have fixed the punishment at five years in the penitentiary. To support the theory of the State that the appellant did the shooting, the State relied upon tracks made by the person who fired the gun; that is, the tracks found where the person who shot was standing at the time the shots were fired, and the correspondence between those tracks and the shoes of the defendant. In further support of the theory that the appellant was the assassin, the State relied upon threats made by the appellant some months before the homicide. There is not a criminative fact in the record beyond these mentioned. There was nothing peculiar about the tracks,—the heels of the shoes not being run down, no patches on the soles, and no tacks. The only proof offered as to a correspondence of the tracks found on the ground with those of the appellant was of the most general character. The shoes were not placed in the tracks, nor was anything like an accurate comparison made between the tracks and the shoes. On this subject Mr. Burrill, in his valuable work on Circumstantial Evidence, lays down the following: "Sometimes such impressions are used to establish the fact of presence more directly, by means of the exact correspondence observed to exist between them and the feet or shoes of the accused, proved (which is always essential) by actual comparison, as by bringing the two objects into juxtaposition, and placing the shoe upon the impression. Where no pe-

·culiar marks are observed, but the correspondence thus proved is merely in point of superficial shape, outline, and dimensions, and those of the ordinary character, it may serve to confirm a conclusion established by independent evidence, but cannot be, in itself, safely relied on, on account of the general resemblance known to exist among the feet and shoes of persons of the same age and sex. But, where certain peculiarities are observed, which at once distinguish the impression from all others, an exact correspondence, verified by the test of comparison, becomes of the highest importance; and the value of such coincidences is obviously increased with the number of the peculiar marks observed." See, Burrill, Circ. Ev., p. 267. As we have said above, there was no peculiarity about these shoes at all, in any respect, except that they were about a No. 3 in size. As stated before, aside from the evidence regarding these tracks, the only other criminative fact against the appellant was testimony of some previous ill will existing between him and R. M. Skipwith. The testimony regarding this ill will was that it was not of an acute character, and antedated the homicide a considerable length of time, with ample opportunities to have executed the threat if he had intended to do so. And, besides, it was shown that, since their previous altercation, they had met and conversed with each other, and were, apparently, on friendly terms. This same character of testimony as to ill will was shown to have existed against said R. M. Skipwith by several other persons in that community. Now, upon these criminative circumstances alone, to-wit: ill will and the vague testimony regarding a comparison of the tracks found and the shoes worn by defendant, the conviction of the defendant was procured. In our opinion, the most that can be said of this evidence is, that it raises a suspicion against appellant that he might have been the perpetrator of the homicide. Evidence in this case of the same character creates a suspicion against other persons in that community. The evidence, as stated, shows that other persons besides the accused entertained ill will against R. M. Skipwith, and we can assume that, in a community of that size, a great number of persons wore No. 3 shoes. In addition, the record shows that a No. 12 guage gun may have been used in the homicide, from the size of the wad found on the ground. The record also shows that a number of persons in that community owned No. 12 guage guns. As was said in the case of Tollett v. State, 44 Texas, 95: "To sustain a conviction, it should appear, not only that the offense as charged has been committed, but there should also be proof tending to establish that the party charged was the person who committed it, or was a participant in its commission to a degree of certainty greater than a mere probability or strong suspicion. There must be legal and competent evidence pertinently identifying the defendant with the transaction constituting the offense charged against him. It is the duty of the court to require that such legal and competent evidence shall be adduced on the trial, in order to sustain a verdict of guilty." We are of opinion that there is not that legal and competent evidence pertinently identifying the defendant with this

murder. · There is no better rule than that the testimony relied upon for conviction must be legal testimony. We are of opinion that illegal testimony was admitted in evidence against the appellant. Appellant proved that some person at night had thrown a brickbat at R. M. Skipwith. Over the objections of the appellant, the State proved, by J. W. Quarles, that Martin said (not in the presence of the defendant)that defendant threw the brickbat at R. M. Skipwith. This was, evidently, hearsay testimony of a very material character. It was not admissible, because appellant had proved that some one had thrown a brickbat. He had a right to make this proof, and the State had a right to prove that he was the man; but the State must prove it by competent testimony, and not by hearsay evidence. The matter pertaining to the special judge and the regular judge both participating in this trial will not arise upon another trial. As it is an important question, we hold that there was no error. See, State v. Womack, 17 Texas, 237; Edwards v. James, 13 Texas, 52; Coles v. Thompson (Tex. Civ. App.) 27 S. W. Rep., 46; Railway Company v. Crawford, (Tex. Civ. App.) 29 S. W. Rep., 958; 1 Thomp. Trials, § 213 et seq. The State introduced the witness, Proctor, and asked him if he had not inquired of Mrs. J. W. Cox for a shotgun, after the killing of Mrs. Skipwith. This he denied. He was then asked if he did not so swear before the grand jury, when they were investigating this case, and if he did not further swear that she replied she did not know where it was. This he also denied. The State then called one Peeples, who was a member of said grand jury, and, over objection of appellant, proved by him that the grand jury had asked these questions of the witness, Proctor, and that he testified before said grand jury that he did inquire of Mrs. Cox for said gun, and she stated, in reply to him, that she did not know where it was. In the first place, by a reference to the statement of facts, this matter was altogether immaterial. Suppose Mrs. Cox had stated that she did not know where the gun was, we cannot see its pertinency to this case. If she had sworn that, at the time or about the time of the shooting, that gun was in the house, then this would have been important testimony for appellant; but she makes no such statement. Mrs. Cox did not testify that she knew where the gun was at the time of the shooting. If Proctor had sworn that she said that she did not know where the gun was, this would not have been impeaching her, but would have been in accord with her sworn testimony. It certainly cannot be contended that they could impeach Proctor, when he denied, himself, making any such statement. A witness cannot be impeached by proving contradictory statements, unless the statements denied were injurious to the party introducing the witness. A mere failure to make certain proof will not warrant this. In the first place, Mrs. Cox could not have been impeached by Proctor, because there is no conflict; and, in the second place, you could not impeach Proctor, because he had sworn to nothing injurious to the State. This is a roundabout way of getting in hearsay testimony, and is not warranted by law. We have repeatedly written upon this subject, and we deem it unnecessary to add

anything to what we have already said. We think the rules pertaining to this matter have been very clearly stated. See, Paris v. State, 35 Tex. Crim. Rep., 82. We are not to be understood as holding that this case should or should not have been continued. However, we are impressed with the belief that some of the facts set forth in the application were very material; but we will not discuss this matter, as it will not likely arise upon another trial. The judgment is reversed, and the cause remanded.

*Reversed and Remanded.*