### MYRA·HILSON v. THE STATE.

No. 9389. Delivered June 10, 1925.

Rehearing Denied State, October 21, 1925.

**Robbery—Evidence—Held Insufficient.**

Where on a trial for robbery, the state relying upon circumstantial evidence alone, the fact that appellant was seen in the near vicinity of the

101 T. C.—29.

crime, and that he fled the state, and from officers, shortly after its commission, will not support a conviction. Such proof may raise a strong suspicion against accused, but does not meet the requirements of the law, where circumstantial evidence is relied upon. See Branch's Ann. P. C. Sec. 1877 paragraph 3, for collation of authorities in support of our conclusions.

Appeal from the District Court of Bowie County. Tried before the Hon. Hugh Carney, Judge.

Appeal from a conviction of robbery; penalty, eighteen years in the penitentiary.

. The opinion states the case.

*Lincoln & Barkman*, for appellant.

*Tom Garrard*, State's Attorney, and *Grover C. Morris*, Assistant State's Attorney, for the State.

HAWKINS, Judge.—Conviction is for robbery. Punishment, eighteen years in the penitentiary.

No exceptions were taken to the admission or exclusion of evidence. The case is submitted here on the one contention that the evidence is insufficient to identify defendant as one of two parties who robbed Orie McKenzie, a negro who had brought his wife to Texarkana for medical treatment. After securing rooms he went out at night and fell in with Webster and Glenn, the three of them visiting various places in the city. McKenzie was a stranger. He became confused in directions, not knowing how to find the way back to his room. His companions offered to accompany him. All of them agree that they tried to get a street-car back but it was crowded and made no stop for them. They then started to walk. As they passed a dark corner two men commanded them to throw up their hands. The two negroes with McKinzie promptly complied. He was a little slow and made some effort to secrete his money. The robbers emphasized their request by punching him in the stomach and face with pistols, whereupon McKenzie dropped his money, being something over fifty dollars. After taking possession of it, the robbers used language the substance of which was, "G— d— you, beat it." McKenzie and his two companions stood not upon the order of their going, and so precipitate was their retirement from that immediate neighborhood that they almost ran over an officer whose attention had been attracted by the expression used by the robbers, and was hurrying to the point to ascertain what was transpiring. The officer said when the negroes met him, "they just kind of spread out there in street." In response to his inquiry as to what the trouble was, one of them replied: "The trouble is right around the corner,"

but none of them stopped running or gave the officer any particulars or information about what had taken place. When the officer reached the corner he saw a negro running at full speed. He pursued him some one hundred and twenty-five yards and overtook the negro as he was trying to start a car. The officer had known defendant four years and swears positively it was he. When this negro was asked what the trouble was he said: "Those fellows back up there was drunk and was going to beat him up." The officer did not know until next morning that McKenzie had been robbed, hence made no search of the negro he had overtaken either for money or a pistol, but seems to have asked him a chance question as to where his partner was. The negro replied he had gone on down the street. The officer got in the car and they drove down the street five or six blocks. The officer told the negro to turn the car around when the negro pointed to some one about fifty yards further on and told the officer that was "his man". They drove up closer and the negro told the officer to get out and get the man; that he (the negro) would stop the car and wait for him. When the officer reached the party, it proved to be a white man just entering his home. When the officer returned to the car, it was locked and the negro gone. The car belonged to defendant's mother. Her story is that defendant had gone to Shreveport; that she loaned the car to one Underwood and another negro about 6:30 o'clock the night of the robbery; that they were to return it by ten o'clock; that they failed to do this, and that she found the car next morning at the police station and learned that her son was charged with robbery; that she wrote him to this effect. He claimed that he was not the party pursued and overtaken by the officer, but that he left Texarkana for Shreveport at 6:40 on the night the robbery occurred, and went from there to Kansas City, where he received a letter from his mother advising him that he was accused of robbery; that this was the first information he had that any robbery had occurred, or that he was charged with it; that he came back home about a week later and was arrested at his mother's house. Bradford disappeared and had been arrested at the time of the trial. Some officers testified that they had seen Bradford and defendant in his mother's car in Texarkana the night of the robbery. There is no evidence in the record identifying Bradford as one of the robbers. We have set out these facts somewhat in detail because to our minds (assuming the officers identification of defendant to be true) they are the strongest circumstances in the entire record, if indeed not the only ones against him.

McKenzie admits he was badly scared when the robbery occurred. He swears that he could not tell who it was that robbed him, but describes them both as big men. He says, "I was scared so bad I couldn't tell who it was if I were to see them now, I didn't know them." We quote from his testimony on this point as follows:

"Q.  Did the description of either one of those men fit the defend-
ant?  A.  He looks more like a boy, to me, looks more like a boy
than them fellows did, they looked to be older than him, looked more
like men than that boy (the defendant) does, and they were broad
shouldered fellows and big through the shoulders.  The defendant
might be one of the men that held me up, but he don't look like him
to me.  I don't know.  If I had to say whether he was or wasn't,
I don't know what I would say—I wouldn't say unless I knowed it.
The policeman said he was one of the men.  Q.  Well, I say does
he suit the description?  A.  Oh, well, he isn't as heavy as the
men that held me up; he don't look like one of them to me, but of
course I would not dispute the policeman's word about it.  The police
got after him and they said they accused Hilson as being one of them.
*   *   *   I couldn't swear that he is the man that held me up, I
don't know who it was."

It is clear that McKenzie did not believe defendant was one of the
robbers.  Webster, one of the parties with McKenzie at the time of
the "hold-up" had known defendant three or four years.  Upon
the question of identity he testified:

"Neither of those men that held me up was the defendant, Myra
Hilson, they was larger thas he is.  I have known Myra three or
four years.  I know him when I see him, and I tell the jury that
neither one of those men wasn't Myra, I know that.  *   *   *   I
did not lose my head when that happened.  I was more excited than
I am now, it scared me all right, but I never lose my mind.  I was
just as cool-headed then as now.  Those men were too large for Myra.
I don't know whether Myra would weigh a hundred and ninety or
ninety-five, or not, that is about my weight and he is not as large as I
am,  *   *   *   I tell this jury that Myra was not the one that held me
up, he wasn't either of those men that held me up."

Glenn (McKenzie's other companion) testified:

"I do not know who it was that held us up.  I will not swear it
was Myra Hilson and I will not swear it was not Myra Hilson that
held us up.  I do not know who either one of them were that held
us up.  I was scared.  I tried to see who it was.  I saw who the law
was.  I recognized him after I had done run a block.  I then stopped
and went back up there.  *   *   *   I have known Myra Hilson all
of his life.  We never did run together but we went to school to-
gether and I have seen him off and on all of my life.  I know his
voice.  I know his walk.  I know his build and his features.  If
I had to say I would say that it was not him."

Over against the positive testimony of Webster that defendant was
not one of the robbers and what was equivalent to the same statement
from McKenzie and Glenn, we have the circumstance that he was
seen by the officer, fleeing from the vicinity of the robbery, his es-

cape from the officer, his disappearance for some three months, and then a voluntarily return to his home where he was apprehended. While flight of one accused of crime has always been provable as a circumstance against him, yet proof of this fact alone is not conclusive evidence of guilt. In Wharton's Crim. Ev., Vol. 2, 10th Ed., Sec. 950, the rule is thus stated:

"At one time in our judicial history, flight resulted in the forfeiture of the goods of the accused, and raised a conclusive presumption of guilt, but flight is now held relevant merely as a circumstance tending to establish guilt, not in itself conclusive; nor can it create a legal presumption of guilt."

To the same effect is Underhill on Crim. Evidence, 3rd Ed., Sec. 204; Elliott on Evidence, Vol. 4, p. 30, Sec. 2724. See also Damron v. State, ——Tex. Cr. Rep.——, 125 S. W., Rep. 396; Sheffield v. State, 43 Tex. Rep. 378. We are not advised of any authority to the effect that proof limited to showing that accused was in the vicinity where a crime was committed, and his flight therefrom, will be sufficient to sustain a conviction for its commission. Such proof may raise a strong suspicion against accused, but does not meet the requirements of the law where circumstantial evidence is relied upon to convict. From a number of authorities Mr. Branch, in paragraph Sec. 1877, Branch's Ann. P. C., deduces the following principle:

"To sustain a conviction it should appear not only that an offense as charged has been committed, but there should also be proof to a degree of certainty greater than a mere probability or strong suspicion tending to establish that the party charged was the person who committed it or was a participant in its commission. There must be legal and competent evidence pertinently identifying the defendant with the transaction constituting the offense charged against him. Hollett v. State, 44 Texas 95; Porter v. State, 1 Texas Crim. App. 399; Jones v. State, 4 Texas Crim. App. 436; Gill v. State, 36 Texas Crim. Rep. 595; 38 S. W., 190; Clifton v. State, 39 Texas Crim. Rep. 619; 47 S. W., 642."

Being satisfied that the evidence in the present case does not comply with the principles announced, it is our duty to reverse the judgment and remand the cause for re-trial, and it is so ordered.

*Reversed and remanded.*

### ON MOTION FOR REHEARING.

HAWKINS, JUDGE.—An examination of the record in the light of the motion for rehearing filed by the State leaves us of the opinion that on the original hearing the proper disposition of the appeal was made.

The motion is overruled.

*Overruled.*