John Connell, Jr., v. The State.

No. 2527. Decided May 20, 1903.

Motion for Rehearing Decided June 24, 1903.

**1.—Continuance—Murder—Habits and Conduct of the Parties.**

On the trial of a son for the murder of his father, a continuance was sought to prove that a remark by defendant, when whisky was being administered to deceased, "God damn it, give it to him straight; he is used to it," did not indicate malice or ill will, the parties being in the habit of using rough language to each other in their ordinary conduct and conversation. Held, if admissible at all, the testimony was immaterial and the continuance properly refused.

## 2.—Change of Venue.

See opinion for facts elicited on defendant's motion to change the venue, upon which, considered in connection with the verdict in the case, it is held the court did not abuse its discretion in overruling the motion.

## 3.—Jury and Jury Law—Bill of Exceptions.

Before a defendant can avail himself of the action of the court in forcing him to challenge a juror who was disqualified, the bill of exceptions must show some other objectionable juror was thereby put upon the panel; that is, that a juror in some degree disqualified was forced upon him.

## 4.—Murder—Evidence—Deceased's Conduct to Other Parties.

On the trial of a son for the murder of his father, specific acts of violence and ill treatment on the part of deceased towards other members of his family were inadmissible in evidence unless such acts and conduct were directly involved in the alleged homicide and grew out of it. Deceased's reputation as a dangerous man, if it had any bearing on the case, was provable by evidence of his general reputation. Special acts, and the details thereof, are not admissible in evidence.

## 5.—Murder—Deceased's Dangerous Character.

The doctrine of being a dangerous man, does not apply in a conflict of testimony, in order to show who was the aggressor.

## 6.—Same—Evidence.

On a trial for murder, it was not competent to prove that deceased, in all his disputes and altercations with others, would never admit that he was wrong, but would always claim that he was in the right.

## 7.—Same.

On the trial of a son for the murder of his father, when, after it had been proven by him that deceased, before the homicide, had cursed his mother and threatened, in his hearing, to throw a lamp at her, it was inadmissible for him to prove that such act had no bearing on this case and did not cause the difficulty which resulted in the homicide.

## 8.—Witness—Refreshing Memory—Copy of Stenographic Notes.

A witness may refresh his memory by reference to a copy of his stenographic notes taken on a former hearing of the case.

## 9.—Murder—Evidence—Statements of Defendant While in Custody.

The statements made to officers by a defendant are admissible in evidence where, at the time they were made, he was not actually in arrest, nor conscious of the fact that he was in restraint, although the officers would not have permitted him at the time to escape from them, and had not warned him as to any statement he might make.

## 10.—Impeachment of Witness.

Where defendant's mother had testified on her examination in chief that the feeling between the defendant and his father had always been kind, that she had never heard defendant make any threats against his father, it was competent to prove by her an incident between the parties in contravention of testimony to the effect that on the first night after deceased was wounded, witness, in answer to a question by one Y. as to how the difficulty came up, she did not reply, that, "John said if the old man curses me again I will cut his guts out," to which she answered "No." And it was competent to impeach her as to an occurrence indicating an unfriendly feeling between the parties, though the method of impeachment was indirect and informal in character.

## 11.—Same.

The testimony of the mother, that the feeling between the parties had always been friendly, was the statement of a material fact upon which she could be legitimately impeached.

## 12.—Improper Argument.

Improper remarks of counsel in argument, as a general rule, will not constitute ground for reversal if they are not excepted to and the court requested to instruct the jury as to such remarks.

## 13.—Self-Defense—Manslaughter—Charge.

On the trial of a son for the murder of his father, the court correctly charged the jury, in effect, that the relationship of the parties would deprive the defendant of none of his legal rights in regard to self-defense in connection with the presumption of innocence and reasonable doubt, and it was

not necessary to tell them that it deprived him of none of his legal rights between manslaughter and murder in the second degree.

## ON MOTION FOR REHEARING.

**14.—Manslaughter—Charge.**

   The statute makes an assault and battery, causing pain, such adequate cause as to constitute manslaughter; and, upon such issue, it was error for the court to instruct that such condition "might" constitute adequate cause. It was also error for the court, in applying the law to the facts, to instruct the jury that if, by such assault, considered in connection with the other facts and circumstances, defendant's mind was, at the time of the killing, rendered incapable of cool reflection, etc., this "might" constitute adequate cause in the opinion of the jury. This charge was directly in the face of the statute, and was calculated to cut defendant off from his defense of manslaughter altogether. Brooks, Judge, dissents.

Appeal from the District Court of Bell. Tried below before Hon. John M. Furman.

Appeal from a conviction of murder in the second degree; penalty, twenty-five years imprisonment in the penitentiary.

The indictment charged appellant with the murder of John Connell, on the 9th day of May, 1902, by cutting him with a knife.

The following general statement is taken from the brief of appellant: Defendant was son and oldest child of the deceased. He was 30 years of age, unmarried, and had all his life lived in his father's family. He had no particular business or occupation, and his wants were freely provided for by his father. He was weak physically, and in this respect was inferior to his father, who, although 70 years of age, was a strong and robust man. The Connell family consisted of the deceased, John Connell; his wife, Jane; their son, the defendant; their two daughters, Sue and May, and their son, Darling, about 18 years of age, and feeble in mind and body. The family lived in the Connell home in the suburbs of the city of Belton. Defendant and his father were on friendly and intimate terms. The father was a man of violent temper and of rough, overbearing manner, and from defendant's infancy had been accustomed to give way to outbursts of anger toward defendant and to assault him with any weapon that might be at hand. The defendant never resented these attacks nor offered to defend himself, but merely kept out of his father's reach until his anger had subsided. It was habitual for defendant and deceased to use cross, rough language in the presence of and toward each other, and to curse each other, said language being habitual and having no particular significance. Deceased's outbursts of anger were sudden and brief and were quickly forgiven and forgotten, and when not in a passion he was affectionate and indulgent to his family, and particularly to the defendant.

The homicide occurred at the home of deceased a little before sundown on Friday, the 9th of May, 1902, under the following circumstances: On the preceding Wednesday night shortly before day the deceased woke and complained that his hand which he had injured in an altercation a few days before, was giving him pain. He got up and lighted a lamp and awoke his wife. They had some conversation and

deceased becoming angry on account of the pain, cursed his wife and said: "God damn you, shut your mouth or I will throw the lamp at you and burn your God-damned head off." Defendant was sleeping in an adjoining room and heard the quarrel, but it being nothing unusual he paid no attention to it whatever. Deceased did not go back to bed, but dressed and sat out on the gallery until breakfast. After breakfast he rode away on his horse. He did not return Thursday night, but came back Friday morning; did not go into the house but got his buggy and drove off towards town. Defendant left the house Thursday after dinner. He went to town and remained away Thursday night and did not return until Friday evening, a short time before the homicide. While in town Friday evening he met the deceased at a saloon and had some friendly conversation with him. The boy Darling was with the deceased, and deceased asked defendant to take Darling home with him. Defendant and Darling left to go home and about the same time the deceased left in his buggy to go to the pasture to drive the cows up, according to his usual custom. Darling became sick on the way home, and when defendant reached the house with him, finding none of the family at home, he put him on the bed in his mother's room and was sitting by him when his mother came home a few minutes later. He reported to her Darling's illness, and inquired of her why he had been sent to town. She told him that he and his father were both absent and that she had nobody else to send; and in the conversation defendant learned for the first time that his father had not returned home Thursday night.

Defendant had arranged to go fishing some miles up the river, and expressed his intention of borrowing the buggy and horse from his father to go in. He began his preparations, he and his mother making an occasional remark, but carrying on no regular conversation. It was defendant's custom when he went fishing to carry with him certain pots and pans and a dirk or bowie knife which was kept about the house. He got this knife and fastened it to his pants, as he contends, for the purpose of carrying it with him fishing. The State denies this, and asserts that he armed himself with the knife for the purpose of using it in the difficulty which he intended to provoke with his father when he returned home. Deceased came home while the defendant was making his preparations to go fishing, and as he drove up with the cows defendant was standing at the west gate. Deceased drove by and around to the north or side gate. He drove up near the fence and threw some newspapers over into the yard, got out of the buggy and began to unhitch the horse, and called out to Darling to "come and get the papers." Defendant replied to deceased, saying: "Darling is sick; I will come and get them," and went over across the yard to the fence. This fence was about four feet high. A brief conversation ensued between the defendant and the deceased, followed immediately by a short struggle between them across the fence, in which deceased was cut. De-

45 Crim.—10.

fendant walked back to the house and deceased walked from the fence down a path a few yards hallooing "Murder," sat down, and when neighbors reached him a few minutes later was found to have been cut in the arm and in the left side. The cut in the arm severed the muscle to the bone. The cut in the side was slight. The wound in the arm caused death from loss of blood. Deceased became unconscious a few hours after he was cut, and died the following Saturday night.

The evidence is conflicting as to the details of the quarrel and struggle between the defendant and the deceased. The deceased gave an account of the occurrence to a number of persons shortly after he was cut, and his statements were admitted in evidence as res gestae and as dying declarations, and are substantially as follows:

"I had been over to Yarbrough's and stayed all night. I drove up to the gate and John met me and asked: 'Where in the hell have you been laying out last night?' I told him that I did not lay out the night before; that I had stayed with my old friend Yarbrough, which I had a right to do if I felt so inclined. John called me a damned liar and I struck at him, and he pulled out his bowie knife and stabbed me." This statement is testified to by numerous other witnesses.

Mrs. M. L. Woodfin testified that she was sitting on her gallery and heard the altercation between defendant and deceased. "The first words I heard—I thought at the time Mrs. Connell said them, but I looked and I did not see her out there—were, 'I thought I told you to leave and not come back on this place.' They were said in a harsh way, and then Mr. Connell replied to it. I sometimes think Mrs. Connell and the defendant's voices sound alike; anyway I know I heard these words, and it was not the deceased who said it. Deceased's reply to these words was: 'God damn your soul to hell, you can not turn me off from my house; I have had you to keep all your life and wait on.' Then it sounded like they were fighting, and I tried not to hear it. The next thing, the old man began to scream 'Murder, murder,' and then to call for Mr. Beamer as loud as he could."

It will be seen that this witness' account of what was said is in direct conflict with the statement made by the deceased.

Mrs. Jane Connell testified: "I did not see the deceased when he drove up, but I heard him talking. The first thing I heard him say was: 'Darling, come and get the papers.' I heard the defendant reply to this: 'Darling is not able to get the papers, and I will come and get them.' I had gotten up and gone into the girls' room, and then I heard deceased speaking loud and in an angry tone. I stepped to the middle door that goes into the middle room just as I heard him talking and that put me in view of deceased and defendant. The first thing I saw defendant do, he stooped to pick the papers up and he said something in a low tone of voice that I did not understand. Then I heard deceased say: 'You are a God-damned liar.' Defendant was on the inside of the fence and his father on the outside, and his father struck at defendant from across the fence and it seemed to

stagger defendant, and defendant then struck at his father and jerked away. I did not see anything in anyone's hand at that time. I ran out to them then. The first thing I heard deceased say was, 'O, he has cut me.' I then ran to him and caught hold of him and he said: 'I tried to kill the damned rascal.' Deceased had his knife in his hand then, and he put it into his pocket, and I took hold of him and said, 'Mr. Connell, come into the house.' He hallooed, 'Beamer, Beamer, murder, murder.' I said, 'Come into the house,' but he kept on hallooing and walking down the road."

· Defendant testified: "I saw my father drive up that evening and noticed some children with him. He called out to Darling to 'Come and get the papers.' At that time I had been to the gate and was coming back to the house after bedclothes, and was right at the southwest corner of the house. When he called to Darling I made the remark that Darling was sick and that I would get them. I turned then and walked out towards where he was to get the papers. As I walked up to the fence I asked him 'Where in the hell he stayed last night.' He said it was none of my God-damned business, and I said I thought it was, and he said, 'You are a God-damned lying son of a bitch.' By that time he started towards me. I was stooping, picking up the papers, and just as I raised he kind of grabbed at me with his left hand. I tried to dart back a little, but he caught me in the collar and struck at me and came at me with a knife, and in an instant as soon as I saw the knife I cut him. I had the knife buckled in a leather strap at my belt. I did not have on a coat or vest, and my suspenders were down. I struck my father to get loose from him and when I got loose I went immediately to the house. He turned me loose when I cut him. I did not intend to kill him, but I cut him to get loose because I saw he would cut me if I did not."

The neighbors gathered in pretty quickly, and the defendant and his mother were endeavoring with the assistance of those present to stop the blood by tying a rope around deceased's arm. Deceased was all the while talking in a very excited manner. Neither defendant nor his mother were having much to say. Among other things, the deceased said: "Jane, you will be satisfied now; this is the last of old man Connell."

Mrs. Duke testified: "The defendant told his father to get up and come on to the house, and the deceased said, 'Take the God-damned rascal out of my sight,' and some one spoke to the defendant—I think it was Mrs. McDonald—and told him to go away, and the defendant walked off to the house just as his father made this remark."

Mrs. Beamer testified: "I heard deceased say to John, 'John, you have murdered me, and go away and do not see me die.' John did not say anything, but when his father said that he turned and walked to the house. I never heard John say a word, but he looked like he was sorry, and looked very pale. He looked just as pale as anybody could look and looked like he was in trouble. He never spoke ex-

cept to his mother about tightening the rope, that it was beginning to bleed."

Jim Shelton testified: "I heard deceased say to John to go on to the house, that he did not want him in his sight, that he had murdered him. John replied that such a little cut as that would not hurt him; that he would live over it. Deceased then got out his knife and I asked him to put it up and he put it back into his pocket. The old man was lying down when he went into his pocket after his knife. The knife was a little bone-handled two or three-bladed knife; he tried to open it and I would not let him, and when he tried to open it deceased made the remark that he would kill John, or something like that. I do not remember whether John made any reply right then or not. Then the old man kicked John with his knee or foot, and shoved him away and told him to go to the house. That happened while we were tying his arm. When the old man kicked John, John said: 'Look here old man, by God, I had just as soon eat you up blood raw as not,' or something like that."

Defendant's application for continuance and also his motion to change the venue are fully shown in the opinion.

The twenty-seventh and twenty-eighth paragraphs of the court's charge, which are referred to in the opinion, are as follows:

27. "Evidence has been introduced by the State for the purpose of showing that Mrs. Connell, who testified as a witness in this case, has made statements to the witness Yarbrough before the examining court different from the statements made by her on the witness stand during this trial. Now, you are specially instructed that such evidence was admitted solely to be considered by you as going to the credibility of Mrs. Connell as a witness, and not as any evidence of the guilt of the defendant, and you can consider such evidence solely for the puropse for which it was admitted, and for no other purpose whatever."

28. "Evidence has been introduced showing that the defendant is a son of the deceased, and I charge you that the fact of such relationship does not in any way abrogate, abridge or change the rules of law herein given you on the question of self defense, presumption of innocence or reasonable doubt."

*J. B. McMahon, Winbourn Pearce,* and *Henderson & Tresman,* for appellant, filed an able and elaborate brief; and upon their motion for rehearing submitted the following argument:

The appellant believes that the court should have reversed this case because of the error committed by the court below in his charge on the law of adequate cause with respect to manslaughter. After giving the statutory definition of adequate cause and after following this up with the statement in the charge that "an assault and battery, producing pain, would or might constitute adequate cause," the court in paragraph 21 of his charge applied the law to the facts of this case in the following language: "In this connection you are further charged that if you find from the evidence that, at the time of the alleged difficulty, the deceased,

John Connell, had made an assault upon the defendant, producing pain, and that such assault, either alone or considered in connection with all the other facts and circumstances in evidence, was capable of creating in the mind of a person of ordinary temper such a degree of anger, rage, sudden resentment or terror as would render the mind incapable of cool reflection; and if you find that same created in the mind of defendant such condition at the time of the killing, the same might constitute adequate cause in the opinion of the jury."

The court gives the general definition of adequate cause. The statute says in plain terms that an assault and battery producing pain is adequate cause. The court charges the jury that an assault and battery producing pain would or might be adequate cause, and then when he sought to apply the law to the very facts of the case which were being considered by the jury, he told them that if they believed from the evidence that at the time of the difficulty the deceased had made an assault upon the defendant, producing pain, and that by reason thereof the defendant's mind was rendered incapable of cool reflection, that then this might be adequate cause in the opinion of the jury.

Every murder which is not committed with express malice and with a premeditated and formed desire to kill is murder of the second degree. Not might be; but is.

Every homicide committed under the influence of sudden passion, aroused by an adequate cause, is manslaughter; not might be.

An assault and battery producing pain or bloodshed is adequate cause; not might be.

It may be that in the concluding part of the court's charge on manslaughter the jury were told that if they found from the evidence that the appellant killed the deceased while in a sudden transport of passion, aroused by an adequate cause, they must find him guilty of manslaughter. But it occurs to us that the part of the court's charge which seeks to apply the law to the facts of the identical case on trial is more likely to be considered and understood by the jury than general abstract propositions and definitions. And to say that the court can misdirect the jury as to the law, provided he gives them a correct charge in any other portion of that instrument, is to make a very liberal draft on the discriminating legal intelligence of the jury.

Then again, while the statute says that an assault and battery producing pain or bloodshed is adequate cause the court in effect tells the jury that there must be an assault and battery producing pain, and also must be that inflamed condition of the mind before it is even left optional with them to find or not the existence of adequate cause.

The appellant cites the following authorities which discuss the question of correct charges on adequate cause. And it will be seen by reading the decision cited in White's Statutes that the doctrine contended for by the appellant is correct. 35 Texas Crim. Rep., 325; 13 Texas Crim. App., 549; 28 Texas Crim. App., 422; 19 Texas Crim. App., 266.

The appellant contends that this court committed error in sustaining

the action of the lower court in giving the following part of paragraph 28 of the charge: "Evidence has been introduced showing that the defendant is a son of the deceased, and I charge you that the fact of such relationship does not in any way abrogate, abridge or change the rules of law herein given you on the question of self-defense, presumption of innocence or reasonable doubt."

The ground of objection is that said charge is clearly upon the weight of the evidence, and in effect tells the jury that while the fact that the defendant is the son of the deceased does not in any degree abrogate, abridge or change the rules of law given to them in charge on the question of self-defense, presumption of innocence and reasonable doubt, that such fact does abridge, abrogate and change the rules of law given therein on the questions of murder in the second degree and manslaughter. The jury may well have concluded from the charge on adequate cause as given in paragraph 21, complained of by the defendant, that at the time of the homicide the defendant's mind was by an adequate cause rendered incapable of cool reflection, and yet, that by reason of the fact that he was the son of the deceased it was optional with them as to whether they should give him the benefit of that merciful provision which, in an ordinary case, would reduce the killing from murder in the second degree to manslaughter. The danger point in the case for the defendant was the question as to whether or not, if guilty, he was guilty of murder in the second degree or manslaughter, and there should have been no uncertainty in the charge as to the boundary line between these two defenses. The jury should have been left no option, but should have been required if they found certain facts to apply certain conclusions of law thereto. The record in this case shows how powerful was the fact that defendant was the son of deceased and was calculated to injure him in the trial of his case. It had been the occasion of bringing the homicide into public notoriety all over the county, and had created a prejudice against his case to an extent that many of the best citizens of the county, including the sheriff and district clerk, did not believe that he could obtain a fair and impartial trial in the county; and any mistake in the court's charge upon this delicate question was well calculated and no doubt did influence the jury to his prejudice.

*J. B. Durrett, W. W. Hair,* District Attorney, and *Howard Martin,* Assistant Attorney-General, for the State, filed an able brief upon the questions of the admissibility of the defendant's statements to the officers and the impeachment of the witness Mrs. Connell by her statements made to the impeaching witness Yarbrough. They did not brief the other questions discussed in the opinions.

HENDERSON, JUDGE.—Appellant was convicted of murder in the second degree, and his punishment assessed at confinement in the penitentiary for a term of twenty-five years; hence this appeal.

The evidence shows that deceased was the father of appellant, the

family consisting of deceased, his wife, two grown daughters, a minor son, and appellant. Their home was situated in the suburbs of Belton. Appellant was an unmarried man, about 30 years of age, and had lived with his father all of his life. Deceased left his home on Thursday morning and did not return until Friday morning, when the homicide occurred. The evidence shows that deceased drove home in a buggy, and called his younger son, Darling, to get the mail he had brought from town. Appellant replied that Darling was sick, and that he would come and get the mail. He went out to the gate for the mail; the altercation occurred which resulted in the homicide, deceased being on the outside of the wire fence and appellant on the inside. During the altercation appellant stabbed deceased in the left arm with a dirk knife the knife also cutting through the vest and striking a rib. The knife penetrated an artery and deceased died from the loss of blood. The theory of the State was that appellant bore some grudge against his father and was angry because deceased had stayed away from home over night; that when he drove up home and appellant came out he asked him why he had stayed out the night before, and deceased said he had stayed all night with his friend Yarbrough. Appellant called him a damn liar, and deceased then hit at or struck him, and appellant then cut deceased with his knife. Appellant's theory was that he went out to where deceased was to get the mail, and as he walked up to the fence he asked deceased where in the hell he had stayed last night? Deceased replied it was none of his damn business. Appellant replied that it was and to this deceased said, "You are a damn lying son of a bitch," and then started towards appellant, who was in the meantime stooping down picking up the papers which deceased had thrown over in the yard. Just as appellant raised up deceased grabbed at him with his left hand, caught him in the collar, and struck at appellant with a knife; and appellant then drew his knife which he had in a leather strap buckled at his belt, and struck deceased a single blow in order to get loose from him; that he cut deceased in order to prevent him from cutting himself.

This is a sufficient statement of the facts in order to discuss the assignments of error.

Appellant made a motion for continuance on account of the absence of Mrs. McDonald, who had been subpoenaed, but at the time of the trial was shown to be sick and unable to attend court. Appellant alleged that he could prove by said witness that she was well acquainted with the family of deceased, and the conduct and general bearing of deceased and his son (appellant) toward each other, and that they were in the habit of using rough language in ordinary conversation between each other, which did not show any animus. This testimony was particularly desired on the part of defendant in order to qualify and explain the meaning and and animus of appellant toward his father immediately after the difficulty, when the expression was proven on the part of the State, to the effect that when some one started to give deceased some whisky, and appellant said: "God damn it, give it to him straight; he is used

to it." "That the witness was present and heard this statement; that said witness, knowing the habits and conduct of appellant and deceased toward each other, would testify that this had no particular meaning, indicating malice or ill will of appellant toward his father." We do not believe that said testimony was material, even if it be conceded that it was admissible. It is not pretended that said witness had ever been present on any previous occasion when deceased and appellant had a difficulty; and the testimony here offered was in connection with a difficulty. The parties had just had a fight, and deceased had been stabbed with a knife by appellant, and a number of witnesses were present on the occasion when the expression was used, and any witness who was present on the occasion when the expression was used would have been qualified to state the tone of voice that accompanied the expression, and the circumstances attending it. It does not occur to us that a witness who may have known how appellant and his deceased father ordinarily treated each other would have been qualified to testify as to how this expression was used, whether angry or not, any more than another witness who was not as familiar.

Appellant made a motion to change the venue on the ground that so great a prejudice existed in Bell County against appellant as that he could not expect a fair and impartial trial. This was controverted on the part of the State. Some fifty witnesses were examined, the witnesses covering almost every section of Bell County. On the part of the appellant, some twenty-seven witnesses testified that the matter had been talked of in the county, and it was generally known that appellant had killed his father, and that prejudice existed against him on that account to such an extent as that he could not expect a fair trial in said county. Some of the witnesses stated that the people said he ought to be hanged for the offense; and others that he ought to be punished severely. On the part of the State, some twenty-two witnesses rebutted appellant's testimony, and stated that there was no prejudice in the county against appellant, and that he could get a fair and impartial trial. On this testimony the court overruled appellant's application to change the venue, and proceeded with the trial, which resulted in a verdict of murder in the second degree, the penalty assessed being confinement in the penitentiary for a term of twenty-five years. We take it that the matter of change of venue was within the sound discretion of the court, and the court was justified in finding against appellant on that issue. Renfro v. State, 42 Texas Crim. Rep., 393. The writer of this opinion believes that this discretion can be tested by the result reached in the trial of the case; and looking at that result, it was demonstrated appellant could get a fair and impartial trial in said county.

Appellant contends that this cause should be reversed on account of the action of the court in the impanelment of the trial jury. The bill of exceptions shows that the juror Bailey (who was one of the veniremen), on his voire dire, stated that he had heard appellant had killed his father, and that he was indicted for said offense, and that the burden of proof

would be on defendant to show his innocence of said offense.   This juror on his further examination by the State, and by the court, qualified this statement; and said, in effect, that he did not mean to say appellant would have to prove his innocence before he would acquit him, and that he could try him fairly and impartially on the evidence, and give him the benefit of the reasonable doubt, as he would any other person.   This juror was challenged for cause by appellant, and the challenge overruled, when appellant peremptorily challenged him.   As to the juror Kuschke, who stated in effect as did the juror Bailey, except that he did not qualify his statement to the same extent as did Bailey, the court held him to be a competent juror, when challenged by appellant for cause; and appellant then exercised on him a peremptory challenge.   At the time this challenge was exercised, some eight jurors had been impaneled, and appelant did not exhaust his peremptory challenges.   Subsequently, when the tenth juror was impaneled, appellant had exhausted his peremptory challenges, when the court reconsidered his ruling with reference to the juror Kuschke, holding he was disqualified, and gave appellant another challenge.   This additional challenge appellant exercised, and the jury was afterward completed, appellant having exhausted his peremptory challenges before it was completed.   The bill does not show that any objectionable juror was afterward placed on the jury.   The court certifies that when the State had accepted the twelfth juror, "defendant's counsel simply said defendant takes the juror."   The rule being that before an appellant can avail himself of the action of the court holding a juror was qualified when he was not, and thus forcing appellant to challenge said juror, the bill must show some objectionable juror was forced on appellant.   We do not understand by this that the jurors forced on appellant must be subject to a peremptory challenge, but their examination must show some degree of disqualification, as, to wit, the formation of some sort of opinion as to the guilt or innocence of appellant, though not a disqualifying opinion.   See Hudson v. State, 28 Texas Crim. App., 323; Holland v. State, 31 Texas Crim. Rep., 345.   For further authorities see White's Ann. C. C. P., art. 673, sec. 750.

By bills of exception numbers 6 and 8, appellant proposed to prove by Susie Connell and Mrs. Connell specific acts of violence and ill treatment on the part of deceased towards other members of the family than appellant.   Among other things, it was proposed to prove by Susie Connell that deceased had assaulted her with a knife on one occasion, and appellant never offered to interfere.   And by Mrs. Connell that on one occasion deceased drew a knife on her and threw it at her and hit her on the head, and frequently assaulted her and her daughters.   Unless these specific acts of violence were directly involved in the alleged homicide and grew out of it, they were not provable.   This was not like the case of Childers v. State, 30 Texas Crim. App., 160, invoked by appellant. In that case the parties were strangers to each other, and appellant was not acquainted with the general character and reputation of deceased; but he did know the specific act or declaration of deceased with regard to

himself, which was provable. In this case the parties were well acquainted with each other; and if deceased bore the reputation of being a dangerous man, and if that fact had any bearing on the case, it could be proved by evidence of general reputation. The general doctrine being that specific acts of violence, and the details thereof, are not admissible in evidence. Heffington v. State, 41 Texas Crim. Rep., 315. Besides this, as shown by the court, all testimony offered was admitted as to the state of feeling between deceased and defendant, and their conduct toward each other; and it was further admitted that, in the opinion of the witness, deceased, when at home and in his spells of anger, was a man of violent and dangerous character among the members of his family. Certainly this character of testimony was more valuable to appellant than testimony of specific acts, for as we understand from the bills, no evidence of any specific act resulting in injury to any member of the family was offered. It is a little remarkable that a man could have a dangerous character in his family, who had lived with his family for from twenty to thirty years and had never inflicted any serious injury upon any member of the family. The most, perhaps, to be shown was that he once threw a knife at his wife and hit her on the head, and no particular injury was sought to be shown. Aside from this, we fail to see what part of the difficulty in which the homicide was committed this character of testimony would serve to illustrate. No threats had been proven by deceased against appellant. We do not understand the doctrine of being a dangerous man to apply, in a conflict of testimony, in order to show who was the aggressor. Here the testimony was of a positive character, and a mere conflict of witnesses as to the particulars of the difficulty; the State's testimony showing that deceased, when abused and cursed by appellant, struck him with his fists; whereas appellant's testimony indicates that he caught him by the collar with one hand and assaulted him with a knife in the other. We fail to see how the specific acts that appellant proposed to show—at most only indicating a turbulent, quarrelsome and overbearing disposition—were calculated to shed any light on this difficulty. Appellant proposed to prove that in all deceased's disputes and altercations with other persons he would never admit that he was in the wrong, but would always claim that he was in the right. We believe that this characteristic attends most people, but it is no reason why the same should be admitted in evidence.

Appellant, after showing by Mrs. Connell that deceased cursed her on Wednesday night (or more particularly on Thursday morning after midnight) and threatened to throw a lamp at her, and that this was in the hearing of appellant, who was in the next room, offered to prove by Mrs. Connell that this was no unusual conduct on the part of deceased. This testimony was offered to show that this incident did not cause the difficulty in which deceased was slain; that is, appellant had introduced this specific act of ill treatment of deceased towards defendant's mother, and then proposed to eliminate it by showing it was not the cause of the difficulty and had no bearing on it. If appellant was not satisfied with the

proof of this specific act he might have made a motion to have the court eliminate and strike it out. But we do not concur in the view that he could introduce this act, and then undertake to show that it had no bearing on the case. Besides, the court permitted appellant to prove any words or conduct between defendant and deceased; and he was also permitted to prove by two members of his family that deceased, when at home among his family and in one of his spells, was a violent and dangerous man. As stated before, we do not find in the testimony regarding this homicide any particular phase of case in which the disposition of deceased toward other members of his family would shed any light. The only essential difference between the testimony of the State and defendant as to what happned during the difficulty is whether deceased assaulted appellant with his hands and fists merely in the first instance or drew a knife on him. We fail to see how the fact that deceased threw a lamp at his wife a few nights before the homicide, and that this was not unusual conduct on his part as to members of his family, would serve to illustrate the evidence in this case, or strengthen appellant's testimony that deceased assaulted him with his knife instead of his fist.

What is said with reference to this bill also applies to appellant's thirteenth bill of exceptions. In this bill it was shown by Mrs. Connell that deceased frequently became enraged at defendant, and would attack him with knives, axes, or anything else at hand. Appellant then proposed to prove deceased's conduct was the same toward other members of the family. It will be seen from this bill that the fullest latitude was given appellant to show specific acts of violence by deceased toward defendant during thirty years in which he lived with his father and under his own roof. While the admission of this testimony was certainly liberal toward defendant, it afforded no reason why the record should be incumbered with other matters having no legitimate bearing upon any question in the case. If defendant was in any danger at all from attack being made by deceased, it was an actual danger, and not apparent. But if the testimony would serve any purpose, it occurs to us that it would tend to show that even if deceased had a knife at the time, appellant must have realized that he stood in no danger from it, for, if during all the years deceased had so frequently assaulted appellant with knives and axes, without any injurious results, it would indicate that on this occasion there were no reasonable grounds for any apprehension of danger.

It is contended that the court committed an error in permitting a State's witness to refresh his memory by a copy transcibed from his stenographic notes on a former hearing. The nature of the testimony is not given; but if it were, there would be no error in this action of the court.

Appellant strenuously urges that the court committed an error in allowing the State's witness, Ike Grubbs, to testify as to an alleged confession of appellant, on the ground that appellant had been arrested at the time and had not been cautioned. The bill shows, in effect, as fol-

lows: That said Grubbs was deputy sheriff, and that after he learned of the difficulty, he, in company with Sparks, another deputy sheriff, both known by appellant to be such, went to the house of deceased for the purpose of making an investigation and an arrest, if the facts justified it. They reached the premises after night, and after deceased had been removed from the place where he had been cut into the house; that he and Sparks went in to find defendant. He went around the house the back way, Sparks going the front way; that he found defendant somewhere about the back gallery and asked him what the trouble was about. Defendant replied that it was not anything much; that he was sorry they had heard of it, and stated that he supposed they wanted a little bond. After this he stated to defendant: "Let's go to the front gate, where Mr. Sparks is." When they reached the front gate, where they found Sparks, witness asked defendant several times to tell him how the difficulty occurred. Defendant at first refused, saying it did not amount to anything; but finally made the following statement: "His father came home that evening and drove up on the north side of the house and called to his little brother to come and get the papers. Defendant said that he answered deceased that his little brother was sick, and that he would come and get them. That he walked out and went up to the fence and asked his father 'Why the devil did you lie out last night?' or, 'Why the devil you didn't come home last night?' or something like that. And deceased said: 'It is none of your business, you damn son of a bitch,' and struck him (defendant). Deceased drew his knife and started over the fence at defendant, and while deceased was up on the fence, defendant cut him, but that it did not amount to anything, just the scratch of a penknife." In this connection, the witness stated that he did not tell defendant he was under arrest, but would not have allowed him to depart; that he did not arrest him until Sparks had gone into the house and made inquiries as to the condition of deceased; that the reason they went around the house when they first went there was that they saw some one leaving and did not know but that it might be defendant, and they did not want him to leave until they had investigated, as they might want to arrest him. Appellant objected to this testimony, on the ground that defendant was under arrest at the time and had not been warned that any statement he might make could be used against him." It has been held that a statement or confession of an accused can not be used against him, although he had not been formally arrested by the officer, if he believes himself under arrest at the time he makes the statement. On the contrary, although the officer would not permit a person to depart, yet if a party does not reasonably believe himself to be under arrest, his confession can be used against him, though he has not been warned. The doctrine being that, if the testimony indicates the party reasonably believes or is conscious that he is under arrest, a confession made, unless he has been warned under the statute, can not be used against him. Nolan v. State, 9 Texas Crim. App., 419; Craig v. State, 30 Texas Crim. App., 619; Jones v. State, 44 Texas Crim.

Rep., 405. The court below held that the circumstances reviewed in this bill did not indicate that appellant, at the time he made the statement, believed he was under arrest. In Jones v. State, supra, the facts were much stronger than in this case. There defendant went to the sheriff for the purpose of surrendering, and had given his pistol to the sheriff before he made the statement. In Craig v. State, the statement of the circumstances, as found in the opinion, shows that the officers, three in number, on horseback, one of them armed with a gun, were on their way to appellant's house for the purpose of arresting him. ' When within two hundred yards of the house, they saw him coming along the road leading to Smith's place. They rode up and spoke to him. Defendant stopped. They did not make any arrest or tell defendant he was under arrest, but they stated that they would not have permitted him to leave, if he had attempted to do so. At this point appellant made a confession. How it came about is not stated. The court holds that the circumstances did not show that appellant was conscious of an arrest. In Nolen's case, supra, the officers, Walk, Tomlinson and Caruthers, being in pursuit of Nolen, reached Camp's house between daylight and sunrise. Nolen was on the gallery, dressed, and putting on his boots. One of the officers passed to the rear of the house, and the other two stopped on the gallery where Nolen was. It seems that the officer who passed to the rear got the saddlebags of Nolen, which contained his pistol and a sack of money, securing the same. It does not appear that Nolen knew they had secured his pistol and money. At this juncture one of the officers accosted Nolen, telling him that they were in pursuit of stolen horses, and wished to examine his caballado; to which he made no objection. The officers made no formal arrest, but stated that they would not have allowed Nolen to go away and they regarded him as a prisoner, but did not think he so regarded himself. The officers were armed and Nolen was unarmed. While there a young man came by and asked Nolen to come and look at some mules, to which he replied that he did not have time to go that trip, as he had to go with the parties to his caballado. Under this state of facts the lower court held that Nolen did not believe himself under arrest. However, the Court of Appeals took a different view of the question, holding that it was not important that defendant should have been informed, in so many words, that he was under arrest; that the facts disclosed by the evidence showed very clearly that the pursuing party, at the time they came upon Nolen, showed that they had secured him, and would not have permitted him to escape if he had attempted, and that his confession subsequently was not admissible against him, as he was unwarned. We do not believe the facts in this case are as strong as in Nolen's case. True, the officers were known by defendant to be such, and as soon as he met Grubbs he told him he supposed he wanted him (defendant) to give a little bond. However, the officer stated no, that they had come to investigate, and merely asked him to accompany them to the front gate where Sparks

was. After going there in company with the officer and after being asked two or three times about the difficulty, he at length made the statement. We believe the judge below was authorized to find, as he did, that appellant was not conscious of being under restraint. See Holmes v. State, 32 Texas Crim. Rep., 361; Gay v. State, 49 S. W. Rep., 612; Stayton v. State, 32 Texas Crim. Rep., 33.

Appellant questions the action of the court permitting the witness J. C. Yarbrough to contradict and impeach Mrs. Jane Connell. In order to present this matter, we copy the bill of exceptions in full, as follows: "After the witness Mrs. Jane Connell had testified in chief, on behalf of defendant, she testified as follows, in answer to the following questions propounded to her on cross-examination by the district attorney. (The defendant having made no inquiry, and the witness having given no testimony concerning the matters mentioned herein below, as a part of her direct examination, except cn direct examination had testified that the feelings between defendant and deceased had always been kind.) 'I never heard John [defendant] make any threats against his father. I know J. C. Yarbrough. He stayed with my husband, after he was sent for, until the next morning; sat up all night and went home the next morning; and he came back and was there the next night, and was there when he died, I think. There is a little back hall in our house, used as a dining room.' Questions by the State: 'I will ask you if you did not have a conversation with Mr. Yarbrough about this matter, about 10 or 11 o'clock the night your husband was cut, in that place there? Didn't he call you to one side and ask you how this trouble came up, and what caused the trouble, and didn't you reply: 'John said if the old man cursed him again, I will cut his guts out?' To which the witness answered: 'No sir; Mr. Yarbrough and I sat there.' Witness further testified that she had never heard John make any such remark or any such statement. And afterward the State introduced Mr. Yarbrough and asked him the following questions: 'State to the jury whether or not, on the first night after Mr. Connell was cut, about 10 or 11 o'clock, in the back hall or dining room, at Mrs. Connell's home, you and she were there toegther, and whether or not, in substance, you asked her: 'What caused this trouble, Jane?' or 'What is this trouble about?' and whether or not she, in substance, replied: 'John said if the old man curses me again, I will cut his guts out.' Defendant objected to the admission of said testimony, because (1) no sufficient predicate had been laid for the admission of the testimony as impeaching evidence; (2) no predicate can be laid for the introduction of such testimony as impeaching evidence for the reason that it is upon a collateral and immaterial issue; (3) the testimony offered is hearsay; (4) the said testimony is of a nature reasonably calculated to injuriously and unduly prejudice defendant in this case before the jury; (5) because said testimony is offered to contradict an original inquiry which the State made of the witness Jane Connell, and the witness with respect to said inquiry was

a witness for the State, and the State having made such inquiry, will not be permitted to contradict the witness' answer. Each and all of defendant's objections were overruled, and said evidence was admitted, and said witness was permitted to testify over defendant s objections, as aforesaid, that the said witness Jane Connell said to him, in the conversation at the time and place before mentioned, as follows: 'John [meaning defendant] said to me [meaning Mrs. Jane Connell]: 'If the old man [meaning deceased] curses me again, I will cut his guts out.' And defendant at the time excepted in open court to the overruling of his objections to the admission of said testimony, and this, his bill of exceptions, is now allowed. * * * Approved with this qualification: At the time the evidence was admitted I stated to the jury that this testimony was (not) admitted as going to the guilt of the defendant, but solely as going to the credibility of Mrs. Connell as a witness; and further, so charged the jury in the general charge."

It will be perceived from this bill that Mrs. Connell was an important witness for appellant; and, among other things, she had testified on behalf of appellant that the feelings existing between deceased and defendant had always been kind. Mrs. Connell on her cross-examination testified that she had never heard John (defendant) make any threats against his father; and she also testified that she had never heard John say, "If the old man curses me again, I will cut his guts out." She was then asked to state to the jury whether or not on the first night after Connell was cut, about 10 or 11 o'clock, in the little back hall of the house, used as a dining room, she did not have a conversation with Yarbrough, in which he asked her how the difficulty came up or what caused the trouble, and she was asked to state if she did not reply that "John said if the old man curses me again, I will cut his guts out." To which witness answered no. Yarbrough was then called and testified that Mrs. Connell did make the statement inquired about to him; that is, that John said "If the old man curses me again, I will cut his guts out." The question as presented is, was this legitimate testimony to impeach the witness? For, if the witness could be impeached upon this character of evidence, we think the predicate was sufficiently laid. Was it upon a collateral and immaterial issue? Observe that the witness, Mrs. Connell, had testified for the defendant that the feeling between deceased and defendant was of a kindly character. In contravention of this, it was permissible for the State to prove by her, if it could, that she had stated to some one else that the feeling between them was of an unfriendly character. Could the State, instead of proving the fact in this general way, show by her that she had stated some incident between them in contravention of her testimony; that is, some occurrence indicating an unfriendly feeling? We think so, though some of the authorities hold that the impeachment must be direct and not of an inferential character. People v. Collum, 122 Cal., 186, 54 Pac. Rep., 589. But the further question arises, if she denies the imputed statement, can she be contradicted upon it?

This involves the question whether or not the impeachment is upon a collateral issue. Observe, the witness has testified for the appellant to a material fact, to wit: the state of good feeling between defendant and deceased; that is, that he bore no malice against deceased. Now, she is asked if she had ever stated a fact in contradiction of her testimony. This she denies. Now, could the State put a witness on and show that she did make such a statement? Evidently this can be done. Why? Because the effect of the contradiction is to dispute her testimony upon a material fact; that is, the state of feeling between appellant and deceased had always been kind. Appellant has cited us to the cases of Drake v. State, 29 Texas Crim. App., 276; Gill v. State, 36 Texas Crim. Rep., 596; Williford v. State, 36 Texas Crim. Rep., 415; Brittain v. State, 36 Texas Crim. Rep., 410; Wilson v. State, 37 Texas Crim. Rep., 68; Wells v. State, 43 Texas Crim. Rep., 451. The general principal announced by those cases is correct, and in accord with the doctrine here announced; but, in our opinion, none of those cases is applicable to the question here presented. In the Drake case, it does not appear that the cross-examination of young Drake was even germane to any matter about which he had testified in chief. He was merely asked on cross-examination if he had made a statement to a certain party that he knew his father was going to kill Guinn (deceased) before he (witness) left home that morning. This was held by the court to be simply a matter of opinion or belief, not legitimate even in cross-examination, much less as affording the subject for impeachment. If Drake had testified in chief that his father had used on the morning of the homicide some expression to the effect that he felt kindly towards deceased, then, on cross-examination, he could have been asked if on that very morning his father did not make use of some expression to the contrary, as a threat; and on his denial of this, with the proper predicate of person, time and place, he could have been impeached, and this would have been a parallel case. In Wells v. State, 43 Texas Crim. Rep., 451, the opinion does not show the character of the examination of the witness Cummings. For aught that appears, he was merely put on the stand by the State in order to lay a predicate for his impeachment. It is said he denied having stated to Pofford that defendant told him the night before the alleged rape that he was going back down to the wagon yard and have carnal intercourse with that woman; and thereupon Pafford was placed on the stand by the State and he testified that Cummings did make the statement to him, appellant not being present. Of course, this was simply hearsay, and hearsay upon a collateral matter about which the witness could not be impeached. If the bill had shown that Cummings testified for the defendant, and he gave evidence of some conversation with appellant in regard to the prosecutrix, beneficial to appellant, then he could have been cross-examined as to a different version of the matter given by him to some named person; and if he had denied this, he could have been impeached; and thus we would have had a parallel case to the one at bar.

It is not necessary to discuss the other cases, as the principle announced by them is conceded. The· cases discussed are those claimed by appellant to have a peculiar bearing upon this question in his case. As heretofore testified, we believe the impeaching testimony was admissible, and that the court sufficiently guarded and limited it in the charge.

Exception was reserved to certain remarks of the district attorney pending the trial, and while the special venire was being impaneled and during .the argument of the case. We are inclined to doubt the propriety of some of these remarks, but as to those which the court was not requested to instruct the jury,· they were not of the character, without such exception, to authorize a reversal. The other remarks, we think, were sufficiently limited by the court's charge. In this connection, the twenty-seventh paragraph of the court's charge, in regard to the impeachment of Mrs. Connell by the witness Yarbrough, we think was a proper enunciation of the law.

We do not think the criticism of the court's charge on manslaughter is well taken. It also occurs to us that the court's instructions as to how the jury were to regard the relationship existing between deceased and appellant was correct. They were charged that because appellant may have killed his father, that deprived him of none of his legal rights in regard to self-defense, in connection with the presumption of innocence and reasonable doubt. It was not necessary that the court should go further and tell the jury that it deprived appellant of none of his legal rights as between manslaughter and murder in the second degree.

We do not think the facts of this case required of the court a charge to the effect that appellant must have resorted to every other means besides retreating before he was authorized to act in self-defense. Nor did the charge given by the court, that he was not bound to retreat, impinge upon his right of self-defense. If appellant's testimony is true, the only means he could have resorted to except those adopted was to retreat, and this the court expressly told the jury he was not required to do. Nor do we believe it was incumbent on the court to instruct the jury as to how they were to regard the alleged dying declaration of deceased; that is to determine whether or not the same were made in view of approaching death. We do not think the testimony raises this issue. Indeed, the alleged declarations were admissible both as such and as a part of the res gestae.

We have examined the requested charges and believe all of those which were required to be given were embodied in the court's general charge; and as to the others, they were not called for.

There being no errors in the record, the judgment is affirmed.

*Affirmed.*

### ON MOTION FOR REHEARING.

HENDERSON, JUDGE.—This case was affirmed at a former day of this term, and now comes before us on motion for rehearing. In the

45 Crim.—11.

original opinion, in passing on the court's charge on manslaughter, we merely said that it was not subject to the criticism of appellant's counsel. But since that time, on his motion for rehearing, appellant has called our attention directly to his bill of exceptions on that subject, and in the argument he has strongly urged that the case should be reversed because of a misdirection to the jury in the court's charge on manslaughter. We quote from the charge as follows, subdivision 4, defining adequate cause: "An assault and battery causing pain would or might constitute adequate cause." And again, in the latter portion of section 21: "You are further instructed that, if you find from the evidence that at the time of the alleged difficulty the deceased, John Connell, had made an assault upon defendant producing pain, and that such assault either alone or considered in connection with all the other facts and circumstances in evidence, was capable of creating in the mind of a person of ordinary temper such a degree of anger, rage, sudden resentment or terror as would render the mind incapable of cool reflection, and if you find the same created in the mind of defendant such condition at the time of the killing, the same might constitute adequate cause in the opinion of the jury." The contention of appellant is that the law makes an assault and battery causing pain adequate cause, and that said charge failed to tell the jury as a matter of law that same was adequate cause, but informed them that such *might* be adequate cause at *their option*. We understand it to be the settled law in this State that, wherever the evidence raises an issue, it is the duty of the court to instruct the jury upon that issue; and if the court had any doubt as to whether a charge on manslaughter should be given in the particular case, the doubt should be resolved in favor of the accused, and the charge be given. Halbert v. State, 3 Texas Crim. App., 656; Hill v. State, 5 Texas Crim. App., 2; Robles v. State, 5 Texas Crim. App., 346; Williams v. State, 7 Texas Crim. App., 396. When the court is required to give a charge on manslaughter, of course the same should be given fully and fairly; that is, it must be an affirmative, direct and pertinent application of the law of manslaughter to the facts of the particular case. McLaughlin v. State, 10 Texas Crim. App., 340; Neyland v. State, 13 Texas Crim. App., 550. Where the adequate cause proven is one of the statutory causes, as assault and battery by deceased causing pain or bloodshed, it is incumbent on the court to present this issue directly to the jury, and to inform them that it is adequate cause, because the statute makes it so. Hill v. State, 8 Texas Crim. App., 142; Foster v. State, 8 Texas Crim. App., 249; Warthan v. State, 41 Texas Crim. Rep., 385. In Foster's case, supra, it was held that, if the court coupled pain and bloodshed, the charge would be reversible error, because either one was sufficient, and it increased the burden on defendant when a charge was given in the conjunctive instead of in the disjunctive. In Hill and Warthan cases, supra, it was distinctly held

that where appellant's defense of manslaughter was based on an assault causing pain or bloodshed, it was the duty of the court to charge directly upon that issue, and to instruct the jury that such an assault was, as a matter of law, adequate cause. In this case there was evidence of a blow struck appellant by deceased before he made the attack on deceased which caused his death; and, under this view, the learned judge who tried this case evidently felt the necessity of instructing the jury on that subject. He told them, as indicated above, not that an assault causing pain was or would be adequate cause, but he told them that it might be. And again, in applying the law to the facts, he emphasized this view by telling them, if they found from the evidence that deceased made an assault upon defendant which produced pain, and that such assault, in connection with all the other facts and circumstances in evidence, was capable of creating in the mind of a person of ordinary temper such a degree of anger, etc., as would render the mind incapable of cool reflection, and that the same did create in the mind of defendant such condition, that the same might constitute adequate cause in the opinion of the jury. Thus leaving it optional with the jury—after they had found all of the other conditions to exist in the mind of defendant, if they found that a blow was inflicted on him by deceased which caused pain—to find, as they might see fit, whether or not the blow so inflicted was adequate cause. This, as we understand it, is directly in the face of the statute, which does not leave it optional with the jury when they find that a blow was inflicted which caused pain, and in that connection finding all the other elements, to then determine whether or not, in their opinion, such assault was adequate cause. If appellant was entitled to a charge on manslaughter at all, he was entitled to an affirmative charge on that subject fully and fairly presenting his defense. The charge in question, however, in our judgment, was calculated to cut him off from his defense of manslaughter altogether, inasmuch as it left to the jury to decide whether or not a cause denominated as adequate cause by the statute, was in fact adequate cause. The jury that tried this case evidently did not believe in appellant's theory of self-defense, and his only other defense to the State's accusation was manslaughter, and this charge cited above was nowhere else corrected, even if it be conceded that such a flagrant error could be corrected, had the effect to destroy that defense. We have given this question a good deal of thought, and we can not let this charge stand as a precedent, nor can we say that it was not calculated to injure his rights. On the contrary, as shown above, we believe that it deprived him of the defense of manslaughter altogether. Accordingly we hold that for this error the rehearing must be granted, and the judgment is reversed and the cause remanded.

*Rehearing granted and reversed and remanded.*

BROOKS, Judge (Dissenting).—I can not agree with the opinion of the majority of the court on rehearing. The following is the charge of the court on manslaughter: "Section 19. The next lower grade of culpable homicide is manslaughter. Manslaughter is voluntary homicide, committed under the immediate influence of sudden passion, arising from an adequate cause, but neither justified nor excused by law. By the expression, 'under the immediate influence of sudden passion,' is means: 1. The provocation must arise at the time of the commission of the offense, and that the passion is not the result of a former provocation. 2. The act must be directly caused by the passion arising out of the provocation. It is not enough that the mind is merely agitated by the passion arising from some other provocation, or a provocation given by some other person than the party killed. 3. The passion intended is either of the emotions of the mind known as anger, rage, sudden resentment or terror rendering it incapable of cool reflection. 4. By the expression, 'adequate cause,' is meant such as would commonly produce a degree of anger, rage, resentment or terror in a person of ordinary temper sufficient to render the mind incapable of cool reflection. An assault and battery causing pain would or might constitute adequate cause or the existence of any other circumstance or condition which is capable of creating and does create sudden passion, such as anger, rage, sudden resentment. or terror, rendering the mind incapable of cool reflection, is adequate cause. And where several of such circumstances might be found to exist, though no one of them might be sufficient, yet all taken and considered together might, in the opinion of the jury, be sufficient to create in the mind of the party killing the above condition of sudden anger, rage, or terror rendering it incapable of cool reflection. Sec. 20. In order to reduce a voluntary homicide to the grade of manslaughter, it is necessary not only that adequate cause existed to produce the state of mind referred to, that is, of anger, rage, sudden resentment or terror, sufficient to render it incapable of cool reflection, but also that such state of mind did actually exist at the time of the commission of the offense. Sec. 21. Although the law provides that the provocation causing the sudden passion must arise at the time of the killing, it is your duty in determining that adequacy of the provocation (if any) to consider in connection therewith all the facts and circumstances in evidence in the case, and if you find that, by reason thereof, the defendant's mind at the time of the killing was incapable of cool reflection, and that said facts and circumstances were sufficient to produce such state of mind in a person of ordinary temper, then the proof as to the sufficiency of the provocation satisfies the requirements of the law; and so in this case you will consider all the facts and circumstances in evidence in determining the condition of defendant's mind at the time of the alleged killing and the adequacy of the cause (if any) producing such condition. And in this connection you are further charged, that if you find from the evidence that at the time of the alleged difficulty the deceased, John Connell, had made

an assault upon defendant producing pain, and that such assault, either alone or considered in conection with all the other facts and circumstances in evidence, was capable of creating in the mind of a person of ordinary temper such a degree of anger, rage, sudden resentment or terror as would render the mind incapable of cool reflection, and if you find the same created in the mind of defendant such condition at the time of the killing, the same might constitute adequate cause in the opinion of the jury. Sec. 22. Now, if you believe from the evidence beyond a reasonable doubt that defendant with a deadly weapon, or instrument reasonably calculated and likely to produce death by the mode and manner of its use, in a sudden transport of passion aroused by adequate cause, is the same is herein explained, and not in defense of himself against an unlawful attack reasonably producing a rational fear or expectation of death or serious bodily injury, did cut with a knife and thereby kill John Connell, deceased, as charged in the indictment, you will find defendant guilty of manslaughter, and assess his punishment." etc.

The only criticism of the charge, and the point upon which the case is reversed, is that portion which reads, as follows: "An assault and battery causing pain would or might constitute adequate cause." It is true that the statute makes an assault and battery causing pain or bloodshed an adequate cause, but does it necessarily follow that because the court, through inadvertence, put the words "or might" in the long, explicit and accurate charge, require a reversal of the case by this court? If so, article 723, Code of Criminal Procedure, upon which previous errors of trial courts have been held harmless, becomes, under the present ruling, a nullity. I deem it unnecessary to cite various cases were more glaring errors were committed in the charge than here suggested, in which the majority of this court have held the errors harmless, in the light of article 723. It will be seen from a casual inspection of the charge above copied that the learned judge authorized the jury to consider the blow in connection with all the other circumstances in passing upon whether defendant's mind was laboring under such a degree of anger, rage, or terror as to render it incapable of cool reflection, and that while so laboring he slew deceased. I think the construction placed upon the charge is hypercritical. This court, in the original opinion, held such' error harmless, and no reason is suggested why the original opinion should not still prevail. All of the authorities cited by the majority to support the present position on rehearing were rendered prior to the passage of article 723, Code of Criminal Procedure, with the exception of Warthan v. State, 41 Texas Crim. Rep., 385. In that case appellant's only reliance to reduce the homicide to manslaughter was the blow, and the court refused to charge the statute. We held, under that state of fact, that we could not say it was not injurious., But here the court charges the statute, adding the words "or might." Can it be seriously insisted that this mere inadvertence should cause a reversal under article 723, Code of Criminal Procedure. I think not.

The original opinion affirmed the judgment on the proposition that appellant was guilty of murder in the second degree. The evidence amply warrants that verdict, and does not, to my mind, suggest manslaughter at all, since the evidence clearly indicates a conspiracy on the part of appellant to kill his father. If this be true, any error in the charge on manslaughter would be harmless. So believing, I can not agree with the opinion of the majority.