## CHUNK DE BOSE v. STATE.

No. A-3850—Opinion Filed April 20, 1921.

(197 Pac. 176.)

(Syllabus.)

1.  **EVIDENCE—Weight and Sufficiency—Circumstantial Evidence.** To support a verdict in a criminal case, based upon circumstantial evidence alone, it is not sufficient that the facts proven coincide with and render probable the guilt of the accused; but the circumstances shown must not only be consistent with the guilt of the accused, but they must exclude, to a moral certainty, every other reasonable hypothesis.

2.  **ARSON—Correspondence of Tracks and Shoes—Insufficient Evidence.** The vague testimony of unfriendly witnesses concerning the correspondence of tracks found and the shoes worn by the defendant at most creates a suspicion that the defendant may be guilty of the offense. Such evidence also has a tendency to cast suspicion on others, and is not incompatible with the innocence of the accused.

3.  **EVIDENCE—Testimony at Former Trial—Sickness of Witness.** An unverified certificate of a purported physician stating "This is to certify that Virgie Selman is in such physical condition that she should not leave home" is not a sufficient showing to warrant the introduction of her testimony taken at a former trial.

4.  **WITNESSES—Contradictory Statements to Discredit.** A party has a right, for the purpose of discrediting the testimony of an adverse and hostile witness, to prove statements made by him contradictory of the testimony given by him, after a requisite

examination of the witness in regard to such statements, whether they are statements of facts or expressions of opinions.

*Appeal from District Court, Creek County;*

*Lucien B. Wright, Judge.*

Chunk De Bose was convicted of arson in the first degree, and he appeals. Reversed and remanded.

*J. R. Miller* and *F. W. Jacobs,* for plaintiff in error.

*S. P. Freeling,* Atty. Gen., and *W. C. Hall* and *E. L. Fulton,* Asst. Attys. Gen., for the State.

BESSEY, J. The material matter about which there is no conflict was that the plaintiff in error, hereinafter called the defendant, and the prosecuting witness, Jim Freeman, both of whom are negroes, lived south of Kellyville, in Creek county, about 2 1-2 miles apart; that each had married the other's sister, and prior to the alleged offense there had been bitter ill-feeling existing between them, growing out of family affairs, resulting in the separation of the defendant and his wife.

It appears from this record that some members of the family favored the defendant. The mother of the defendant and his sister-in-law testified for the defendant, sharply controverting the testimony of the prosecuting witness. Jim Freeman, brother-in-law of the defendant, and the testimony of his sister, wife of Jim Freeman, and the testimony of another sister, Virgie Selman. These were all willing, eager witnesses, and their testimony on several material matters was conflicting.

It appears that on Saturday night, March 1, 1919, the prosecuting witness and his wife, a school-teacher, Eva McCoy, and a young negro, Joe Pinue, who was courting Eva McCoy, had been playing cards from dusk until near mid-

night in Jim Freeman's house, where the fire originated; that it was a cold night, and that they had a good wood fire burning in a Big Ben heating stove; that just after they had all retired for the night, and before any of the parties had gone to sleep, the fire was discovered in the valley of the roof of the building; that they all arose and proceeded to extinguish the fire, after it had burned a small hole in the roof; the young man, Joe Pinue, went upstairs and with his fist knocked out some shingles around where the fire was burning, and a bucket of water was handed to him, which he applied from the inside. The prosecuting witness and the schoolma'am threw on water from the outside; that a stovepipe extended from the stove into a tin saddle fastened on the comb of the roof; that originally there was some pipe extending upwards from this tin saddle, but that this pipe above the roof had blown off.

The prosecuting witness and his wife testified that a piece of partially burned quilt, which they claimed belonged to the defendant and which had been saturated with oil and water, was found on the roof where the fire was. The disinterested witnesses, Joe Pinue and Eva McCoy, made no mention in their testimony of this quilt. The prosecuting witness testified that out at the chicken house he found a piece of rubberoid roofing partially covered with crude oil, and this rubberoid roofing or tar paper was by other witnesses identified as belonging to the defendant; that the ground about the premises and in that neighborhood was of a sandy nature, and that a man's shoe tracks led from the house where the fire occurred to a spot about 200 yards distant where there had recently been a fire; and where it appeared from the horse's tracks and the condition of the ground that a horse had been tied, and this horse's tracks led from this place to near where the

defendant lived, and corresponding tracks led from near the defendant's home to near the place of the fire. It was claimed that by actual measurement these shoe tracks corresponded to the shoes worn by the defendant on the morning following the fire, at the time of his arrest.

Joe Eldridge, a deputy sheriff living in the country near by, arrested the defendant on the morning following the fire and placed him in jail, and later went back to the premises of the defendant to look for evidence. In the beginning this deputy and the prosecuting witness suspected that one McElway, who lived about 50 yards from the defendant, had committed the offense. After going to Mc-Elway's house, the deputy, McElway, and several others, in the absence of the defendant and his family, went into the defendant's house in the nighttime, and by means of lighted matches found and took possession of some of the defendant's clothing, said to be soiled with crude oil. The shoes of the defendant, several pieces of clothing, the oil-stained piece of quilt, and another piece of quilt, said to correspond with it, and the piece of oiled rubberoid were some time afterwards tied up in a gunny sack and turned over to the sheriff. The defendant claimed that these crude oil stains were placed on his clothing by some other person, and that the pieces of quilt were not his property and never had been in his possession.

The deputy sheriff testified at great length concerning the different human tracks and horse tracks found at different places. With reference to the horse's tracks this deputy testified that they led from near the place of the fire to near the defendant's home, in one direction only. On cross-examination he repeated and insisted that the tracks led toward the defendant's home, and that these

were the only tracks found. Later, after a court intermission, and after having had a conference with the county attorney and others interested in the prosecution, he was recalled and testified that these tracks led both to and from these places. Other witnesses testified that there were four of these tracks, two leading each way. The testimony of these witnesses as to both the horse tracks and the shoe tracks was conflicting and confusing.

There was evidence that the prosecuting witness kept three dogs at his home, but there is no evidence that any of them barked or made any alarm on that particular night.

It appears that these lived in an oil-producing district, and that there were numerous oil tanks thereabouts, and that these tracks led by a small stream or ditch where there was a pool of water covered with oil, and that there were oil stains on the stones next to the pool, and that there were some finger prints on the stones.

The defendant and his witnesses testified that the piece of quilt introduced in evidence never did belong to him; that the tracks leading to and from the place of the fire were not made by defendant and did not correspond to the shoes he wore. The defendant claimed that he was at home all of that night with his two little boys, and that after he was arrested the following morning he voluntarily removed his shoes for the purpose of having them fitted into the tracks claimed to have been made by him, and that the shoes did not fit the tracks. It was the theory of the defendant that this prosecution was maliciously framed up by the prosecuting witness, Jim Freeman, and this record in some particulars gives color to this theory.

There was no positive direct evidence that the de-

fendant committed the crime charged. The state's case rested almost wholly upon the circumstantial evidence of the tracks and the identity of the oiled quilt and piece of oiled rubberoid, all of which was in many important particulars conflicting.

Where there is direct, substantial evidence supporting a verdict, although conflicting, this court will not ordinarily disturb a verdict on the ground of insufficient evidence; but where the evidence is almost wholly circumstantial, and not such as will preclude any and all hypothesis consistent with the innocence of the defendant, this court will not hesitate to set aside a verdict based on such circumstantial evidence. The mere union of a limited number of independent circumstances, each of an imperfect and inconclusive character, will not justify a conviction. They must be such as to generate and justify full belief, according to the standard rule of certainty. It is not sufficient that they coincide with and render probable the guilt of the accused, but they must exclude every other reasonable hypothesis. No other conclusion but that of the guilt of the accused must fairly and reasonably grow out of the evidence, and the facts must be absolutely incompatible with innocence and incapable of explanation upon any other reasonable hypothesis than that of his guilt. *Inkelbarger v. State,* 8 Okla. Cr. 316, 127 Pac. 707; *Matthews v. State,* 8 Okla. Cr. 676, 130 Pac. 125; *Carter v. State,* 6 Okla. Cr. 232, 118 Pac. 264.

The instruction on circumstantial evidence given in this case seems to have been copied from the decision last cited, and is approved as a good abstract statement of the law on that question.

It would seem that little credence should be given some

of the circumstances shown and relied upon by the state in this case. Whether a piece of cotton quilt recently soaked in a pool of water covered with oil would accelerate or retard a fire might be an open question. Bearing in mind that there had been ill feeling existing between these parties, it would be as probable to suspect that the prosecuting witness desired the removal of the defendant from the community as to suspect that the defendant desired to get rid of his brother-in-law by burning his home. We find it difficult to understand how the defendant, without being detected could take an oil and water soaked cloth and set fire to the roof of a house occupied by a card party where the master of the house kept three dogs.

Applying the rule of circumstantial evidence stated above, the circumstances proven by the state, if believed by the jury, do not exclude the following reasonable or probable theories of the innocence of the defendant, viz.:

(1) The fire on this shingle roof may have ignited from live embers from the wood fire kept burning for several hours in the Big Ben stove, emitted from the tin saddle on the comb of the roof.

(2) The piece of quilt soaked in oil and water may have been placed on this roof by some person other than the defendant.

(3) There may have been many persons in that community who wore shoes that would have made tracks in the yielding sand such as were found leading to and from this house, and many different horses may have made tracks similar to those identified by the state's witnesses.

(4) The defendant may have been innocent of the

crime charged, and these tracks and the oil-soaked piece of quilt may have been so arranged by the guilty person to divert suspicion from the real perpetrator of the offense, and intended to cast the suspicion on the defendant.

On the subject of tracks, Mr. Burrill, in his work on Circumstantial Evidence, lays down the following rule:

"Sometimes such impressions are used to establish the fact of presence more directly, by means of the exact correspondence observed to exist between them and the feet or shoes of the accused, proved by actual comparison, as by bringing the two objects into juxtaposition and placing the shoe upon the impression. Where no peculiar marks are observed, but the correspondence thus proved is merely in point of superficial shape, outline, and dimensions and those of the ordinary character, it may serve to confirm a conclusion established by independent evidence, but cannot be, in itself, safely relied upon, on account of the general resemblance known to exist among the feet and shoes of the persons of the same age and sex."

"Upon ill will and the vague testimony concerning the correspondence of the tracks found and the shoes worn by the defendant, the conviction of the defendant was procured. In our opinion the most that can be said of this evidence is that it raised a suspicion against the defendant that he might have been the perpetrator of the homicide. Evidence in this case of the same character creates a suspicion against other persons in that community."

See *Gill v. State*, 36 Tex. Cr. R. 589, 38 S. W. 190.

In another Texas case the court went so far as to hold that, where it was not shown that there was any peculiarity about the tracks seen at different times and places, observed and compared by a witness, and the dimensions and size of the tracks were not stated, such testimony

would be inadmissible and without probative force. If under such circumstances the testimony concerning the tracks was inadmissible, it would seem that under the circumstances in this case the testimony would be admissible, but of doubtful probative value. *Ballenger v. State,* 63 Tex. C. R. 657, 141 S. W. 91; *Tankersley v. State,* 51 Tex. Cr. R. 173, 101 S. W. 234.

Applying the rule applicable to a conviction predicated upon circumstantial evidence that the circumstances shown must not only be consistent with the guilt of the defendant, but that they must exclude to a moral certainty every other reasonable hypothesis, we hold that the evidence in this case is insufficient to support the verdict.

There was no sufficient predicate laid for the introduction of the testimony of Virgie Selman, taken at a former trial and introduced over the objections of the defendant. Virgie Selman was present in court the day previous, and the state, as a foundation for the introduction of her testimony, presented the following:

> "Dr. J. W. St. Sing,
> "Physician and Surgeon
> "Kelleyville, Okla., January 19, 1920

"To Whom it May Concern:
"This is to certify that Virgie Selman is in such physical condition that she should not leave home.
> "J. W. St. Sing, M. D."

This certificate was not verified; no showing was made as to the nature of the malady afflicting the witness, or that she was this doctor's patient; and no showing was made as to the qualifications of the physician. We assume that J. W. St. Sing was a reputable practicing physician, but this is a mere presumption.

For the purpose of laying a foundation to show that the prosecuting witness, Jim Freeman, had made other and conflicting statements inconsistent with his testimony then being given, he was asked:

"You told Chunk's mother, Louisa De Bose, that you didn't believe Chunk did this, didn't you?"

"Didn't you tell Joe Eldridge, when Joe Eldridge brought Chunk there that morning, that you didn't believe that Chunk set your house afire?".

"Didn't you tell Mr. Jacobs and myself, right over there in the addition on Sunday morning, when we met you there in the car, that you did not believe Chunk set your house on fire?"

To all of which questions objections were interposed by the state and sustained by the court. The defendant sought to show by a number of other witnesses that Jim Freeman and Joseph Eldridge, the deputy sheriff, had stated to them, at different times, that they did not believe that Chunk De Bose was guilty of the offense charged, to all of which objections were interposed and sustained.

This whole case rested largely on the testimony of Jim Freeman, who was a most willing witness, eager to fix the crime upon the defendant. It was competent and proper for the jury to know whether this witness had made contradictory or inconsistent statements out of court. His testimony tended to show that the defendant was guilty, and the jury had a right to know why, at a time when he was in possession of all the facts, he had entertained a belief that the defendant was innocent, and upon what facts he based that conclusion, and whether or not he was

withholding facts that should go to the jury. If Jim Freeman, knowing all the facts, entertained doubts of the defendant's guilt, and if the deputy sheriff, the "Sherlock Holmes" in the case, was also in doubt, it is reasonable to infer that the jury, in possession of the same information, would have had like doubts. We think it was error to exclude this testimony.

It has been held in many cases that a witness who testifies to facts cannot be discredited by showing prior expressions of opinion by him, even though such expressions tend to contradict the inferences which may be drawn from his recital of facts; but there are circumstances under which the courts have held to the contrary, and where the circumstances appear as disclosed in this record, upon reason and good authority the facts related by the witness and his opinions and belief to the contrary may and should be a subject of inquiry. In the case of *Dudley v. Satterlee*, 8 Misc. 538, 28 N. Y. Supp. 741, it was held:

"A party has the right, for the purpose of discrediting the testimony of an adverse and hostile witness, to prove statements made by him contradictory of the testimony given by him, after the requisite examination of the witness in regard to such statements, whether they are statements of fact or expressions of opinion."...

See, also, *State v. Lewis*, 44 La. Ann. 958, 11 South. 572; *State v. Hughes*, 71 Mo. 633.

The testimony of Abner Bruce, the sheriff, was to the effect that the exhibits, the pieces of quilt, the articles of clothing, and the piece of rubberoid roofing were all left in his custody, and that one of the pieces of quilt had, by some person unknown, been stained with oil after it was

placed in his custody, and that the piece of rubberoid was taken away by some person to him unknown, showing, as we think, that some interested person had attempted to suppress or manufacture evidence, and that the tampering with these exhibits in this manner made some of them inadmissible as evidence. This record also shows that Jim Freeman had access to all these exhibits before they were delivered to the sheriff, which fact, in connection with the tampering with the exhibits after they were paced in the custody of the sheriff, strengthens the theory of the defendant that Jim Freeman may have been the guilty person.

For the reasons stated in this opinion, this case is reversed and remanded, with direction to proceed in accordance with the views herein expressed. The warden of the penitentiary at McAlester will deliver the defendant to the sheriff of Creek county, who will hold him in custody until otherwise ordered according to law.

DOYLE, P. J., and MATSON, J., concur.