# HAROLD EDNEY et al. v. STATE.

No. A-8798.   July 26, 1935.
(48 Pac. [2d] 340.)

R. S. Howe and H. M. Shirley, for plaintiffs in error.

J. Berry King, Atty. Gen., and J. H. Lawson, Asst. Atty. Gen., for the State.

DOYLE, J.   The plaintiffs in error were jointly charged, tried, and convicted in the district court of Okfuskee county, upon an information which charged them with an attempt to commit burglary.   The jury failed to agree on the punishment.   Motion for a new trial was presented and overruled.   March 6, 1934, the court rendered judgment on the verdict and sentenced each defendant to im-

prisonment in the state reformatory at Granite for a term of six months. From the judgments, they appeal.

The information in substance charges that on September 18, 1933, the defendants attempted to commit the crime of burglary by sawing the lock on a storage building, owned and occupied by Okfuskee county, said building being a place where gasoline, fuel oil, tools, and other articles owned by said county were kept, with intent to steal and carry away said personal property.

Several assignments of error question the sufficiency of the evidence to sustain the verdict.

A substantial statement of the evidence is as follows:

Dan Ward testified that he was night officer at Weleetka. First saw defendant Harold Edney about twelve o'clock Sunday night September 18th, and found the defendant Eugene Akers about two hours later about 300 yards west of the county warehouse; that about 11 or 12 o'clock he found the lock of the warehouse sawed off and the door half open, and saw a car a little ways from the warehouse. Mr. Hartman came up and they took the feed line off the car; then he went to town to get a filling station man to haul in the car. The man was getting his truck out to go get it, and this redheaded boy, Edney, came up and said he had been hijacked. He was barefooted, and had on pants and undershirt; he told him they were going after that car, and the boy said, "That is my car, I will go down there with you." When they got back with the car the boy said the hijackers took him out on the highway two or three miles. He started to jail with him and the boy said "Please don't take me to jail, my buddy might be tied down there in that corn and would lay there all night and die." The boy said they took $5 off of him and

$6 off of the other boy; he got loose from them out on the highway toward Wetumka; that they found the other boy, Akers, down in the cornfield, both his hands and feet were tied with pieces of a shirt. He said two hijackers took him out there and tied him up; he said they stopped there to sleep and were sitting in the car when the hijackers appeared; that the county building was on the railroad right of way, and the county has oil, tools, and machinery in it: that he did not know whether or not gasoline was kept there; that he put the Edney boy in jail there, and took the other one to Okemah. That the next morning he trailed two tracks from the warehouse out through the cornfield to where this boy was tied down; that in the car he found a lot of clothes, some kind of school business "basket ball or something," two cans in the back end; that a milk can was wired on the side; that out on the Wetumka road the next morning about 350 yards from a filling station, he found clothes with a pair of shoes rolled up in them, and a bundle of clothes with a hack saw, two flashlights, a pair of pliers, an automatic pistol and six cents in money in the clothing; that both boys said they had come down there to get work.

Charles Hendricks testified that he went with Dan Ward and found the boy in the cornfield; that his hands were tied behind him and his feet were tied and the mosquitoes were about to eat him up. The boy said somebody came to the car and hijacked them; that the door of the warehouse was open, but he did not see the lock; that Mr. Wilson, county commissioner, carried the key to the warehouse. That when they got back he got his car and took the boy to Okemah; that he was not an officer but had been a deputy sheriff.

Arthur Hartman testified that he was a car inspector

for the Fort Smith and Western and on his way from the water tank to the depot, he flashed his light and saw a Chrysler car and heard a noise like some one was trying a lock or a chain was rattling against that tin building; that he saw Dan Ward at the depot and told him something was wrong and Ward went over there; that he noticed the door of the warehouse was open, but did not see the condition of the lock; that he saw the Edney boy with Dan Ward and saw the Akers boy when they brought him in from the cornfield. On cross-examination he stated that he helped to take the gas line off of the car; that he unscrewed one union and Dan Ward unscrewed the other.

Alex Ledford testified that "Dan Ward is my step-father, he can't drive a car" and he drove their car out on the highway towards Wetumka, where they found the clothing; that the distance, in his judgment, from the warehouse to where the clothes were found, was a good half mile.

At the close of the state's evidence, the defendants moved for a directed verdict of acquittal, for the reason that the evidence is insufficient to warrant a conviction.

The testimony of defendant Harold Edney in his own behalf is as follows:

"My home is in Britton, my age is 23. I had been working for the Midwest Supply Company and was laid off when Eugene Akers was laid off. I was told that if I would go to Checotah, I would get a job there, we left Oklahoma City in Akers' car Friday afternoon, drove to Holdenville and stayed there with Akers' wife and his folks. On Sunday morning we drove to Weleetka. I was advised to stop at Weleetka and see the man who was loading out machinery for Moran and Buckner, I talked with him and he told me to stay. We stayed around there and drove to the Cotton Compress that day; that evening we

thought we would sleep in the car and about 9 or 9:30 we were hijacked. After that I don't know what happened to Akers. They put me in their car and drove out of Weleetka two or three miles, took my clothes and shoes and told me I could go, on the way back, I stopped at a filling station and asked a boy to take me to town and help me find the law, he said he would and we drove around town looking for the law and found Mr. Ward who said he had a car to go and get, I went with him and it was our car. When we got back, he locked me in jail, the next morning I was brought to Okemah. I had a set of mechanic tools, some carpenter tools, two pair of shoes, toilet articles and an automatic pistol in the car. When they were turning my car a man called Hartman came up and wanted to know what happened, it was explained to him and he said 'Well, I saw the car here and it looked funny that no one was around it.' He said he went to the depot, and told Dan Ward that this car was up there and no one around it. After we got the car, I told them they ought to try to find Akers and see if he was hurt, or telephone his folks, they said they would do that and they put me in jail. I did not tell Mr. Ward that Akers was tied up down there. I did not see Akers again until after the preliminary hearing. I was 93 days in jail before I was released on bond."

Defendant Eugene Akers testified:

"I live at Britton in Oklahoma county. When we pulled up to that place that night it was around nine-thirty or ten and we hadn't no more than dozed off when someone holloed on the side, 'get out.' It scared me, I didn't know what was happening, we had a tool box on the running board that kept the door from opening on that side. I supposed at the time they were laws. They took me out, and shook me down, then took me in front of the car, took my shirt off, stripped it up and tied my hands. I don't know what happened to Harold, he disappeared. They had me around the car 15 or 20 minutes, then took me north thirty or forty yards, turned west aross the main track into a cornfield. I tried to trip the man and he hit me on the side of the head with a gun, then finished tying me there; tied

my hands and feet together. That is the last I saw of him, it was breaking daylight when they found me, I was almost eaten up by the mosquitoes, I had $7 or $8. Harold was closely associated with Frank Fisk, a member of the Moran and Buckner Company and we came down there for work. The car was mine. At Holdenville we stayed with my wife's folks."

On cross-examination he stated:

"We stayed at Holdenville Saturday night; stayed in front of my wife's folks' house."

He was then asked:

"Q. I will ask you if, in the preliminary hearing you didn't testify this in substance: that you stayed outside of Weleetka on the road? A. I did not."

"Q. Eugene, I will ask you if, at the preliminary hearing in this case, the following question was not asked you: Where had you boys stayed the night before you had got in Weleetka? A. I don't remember."

Delbert Howard testified:

"I have been employed for more than a year by T. R. Garden, who operated the filling station. On this night one of the boys came to the station, woke me up and asked me if I would take him to town, saying that he had been hijacked. He had on trousers and undershirt. I took him to town and drove up and down the main street two or three times and a few side streets looking for Dan Ward. We finally located him at the Fleming Chevrolet garage and I let him out there."

Mrs. J. M. Jenkins testified that these boys came into the cafe about noon on Sunday, had lunch and paid for it.

Steve Pennington testified:

"I live at Oklahoma City, am a contractor and builder, have known Harold Edney for four years, he is a plasterer and worked for me. I know his general reputation in

the community where he lives, for being a peaceable, honest, law-abiding citizen and that reputation is good."

On cross-examination he stated that Mr. Edney worked for him off and on for two years, and named other contractors that he had heard say that Mr. Edney's character was good, and that he was an industrious young man.

H. F. McMann testified that he knew the general reputation of Harold Edney in the community where he resides as being a peaceable, law-abiding citizen, and that reputation is good.

R. C. Delautre testified he lives at Oklahoma City, had known Mr. Edney for fifteen or sixteen years, knows his general reputation in the community where he lives as being a peaceable, quiet, law-abiding citizen, and his reputation is good.

Joe Delautre testified he had known Mr. Edney five or six years and knows his general reputation in the community where he resides for being a peaceable, good, law-abiding citizen, and that reputation is good.

In rebuttal: O. P. Nash testified that he was county attorney of Okfuskee county; as such conducted the preliminary hearing of the defendants, and defendant Akers, as a witness, was asked: "Question, 'Where had you boys stayed the night before you got in Weleetka?' and answered, 'In the car out on the road right in town.'"

The rule is well settled that this court will not disturb a verdict on account of the evidence, where there is evidence to support it; the converse rule is equally well settled that it is not only the province, but the duty, of this court to set aside such a verdict when it is contrary to the evidence, or where as a matter of law the evidence is insufficient to support it.

The probative force of good character depends upon the nature of the alleged crime and upon the quality of the inculpatory evidence. The cases in which it carried great weight are those in which the testimony adduced in support of the charge is entirely circumstantial.

Taking all the circumstances of this case into consideration, it is our opinion that as a matter of law the evidence is insufficient to support the verdict and judgment of conviction. The only evidence that directly tends to show an attempt to break and enter the building in question is that of the witness Ward. He alone testified that he found the lock had been sawed off. Two other witnesses testified that they noticed the door of the building was open. There was no testimony tending to show that these defendants attempted to break and enter this building with intent to steal.

In cases of this character, where the state relies wholly on circumstantial evidence, and that of doubtful probative force, and the facts and circumstances in evidence are of such a character as to fairly permit an inference consistent with innocence, it cannot be regarded as evidence sufficient to support conviction.

In the case of De Bose v. State, 18 Okla. Cr. 549, 197 Pac. 176, 178, it is said:

"The mere union of a limited number of independent circumstances, each of an imperfect and inconclusive character, will not justify a conviction. They must be such as to generate and justify full belief, according to the standard rule of certainty. It is not sufficient that they coincide with and render probable the guilt of the accused, but they must exclude every other reasonable hypothesis. No other conclusion but that of the guilt of the accused must fairly and reasonably grow out of the evidence, and the facts must be absolutely incompatible with innocence

and incapable of explanation upon any other reasonable hypothesis than that of his guilt."

Where the evidence only raises a mere suspicion of the guilt of the accused, it is insufficient to sustain a conviction. Suspicion is not proof, and the trial court should have directed a verdict of acquittal. Because the verdict is contrary to the law and the evidence, the judgment appealed from is reversed.

DAVENPORT, P. J., and EDWARDS, J., concur.