CARL COURTRIGHT v. STATE.

No. A-10339. 'Dec. 20, 1944.

(154 P. 2d 588.)

Leon J. York, of Stillwater, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Jess L. Pullen, Asst. Atty. Gen., and K. D. Greiner, Co. Atty., of Stillwater, for defendant in error.

BAREFOOT, J. Defendant, Carl Courtright, was charged in the district court of Payne county with the crime of larceny of domestic animals, to wit: "one 5-year old red cow; one 3-year old red roan heifer; one 2-year old dark yellow heifer; one 2-year old black and white spotted heifer; one 1½-year old red and white heifer; one 1½-year old light red heifer; one red yearling heifer, one short red yearling heifer; and one yearling heifer red with brindle stripes." He was tried. convicted, and sentenced to serve a term of three years in the State Penitentiary, and has appealed.

Defendant relies upon two propositions for a reversal of this case:

First: "The evidence is insufficient to sustain the verdict of the jury:

Second: "Admission of incompetent evidence over the objection of the defendant."

The defendant was charged with the larceny of the above-described cattle from the pasture of Gilbert Dry, the owner, eleven miles west and four miles south of Stillwater, in Payne county, on the night of Wednesday, December 31, 1941. The evidence is almost wholly circumstantial, and that is the basis of defendant's contention that it is insufficient, under the law, to sustain the verdict and judgment.

For a proper consideration of the propositions, it is necessary to give a short statement of the evidence, as revealed by the record.

The evidence discloses that Gilbert Dry was the owner of the cattle involved; that his son fed them on December 31, 1941, about 4 o'clock in the afternoon; that he returned to the pasture on January 2, 1942, for the purpose of feeding them, and was unable to locate them; that the sheriff of Osage county was notified; that the sheriff and a deputy went to the Dry farm and made an investigation; that they found where a truck had been backed up to the fence and the cattle loaded; that they found the tracks of the truck, and also human tracks at the place where the cattle had been loaded; that these officers and others returned to the scene the next morning and plaster of paris casts were made of the tracks made by the truck, and also of the human tracks. The truck used in transporting the cattle was a six-wheel truck, four wheels on the back and two on the front. Defendant owned just such a truck, which was found parked in front of his home three miles south and three-fourths of a mile west of Barnsdall, in Osage county, on January 10, 1942, at which time he was arrested.

According to the officers, the positions of the wheels on the truck had been changed, and the wheels were not in the same positions on the truck when it was found as they were at the time the cattle were loaded, and the plaster of paris casts made. Some hair similar to that of the cattle above described was found in the truck; also droppings which, according to the witnesses, was about a week or ten days old. Defendant first stated to the officers that the truck had only been used for hauling hay, but when confronted with the above facts, he stated that he had loaded one cow in the truck on December 23, 1941, for the purpose of taking her to town for sale; that she had remained in the truck over night and he had released her the next morning, when he decided not to sell her.

The cattle were found by W. B. Hampton on January 4th or 5th, 1942, in his pasture seven miles southwest of Bartlesville, in Osage county. Mr. Hampton at the time had a broken leg, and he immediately notified his neighbors that the cattle were in the pasture, and asked one of them to notify the sheriff of Osage county. This the neighbor failed to do until about March 27, 1942, and the cattle were recovered by Mr. Dry the latter part of March. About the time he discovered the cattle in his pasture, Mr. Hampton observed the tracks of a dual-wheel truck, where the same had been driven into his pasture and turned around, and presumably where the cattle were unloaded.

The defendant was never at any time seen with the cattle in his possession. He lived in Osage county, and about 17 or 20 miles from the home of W. B. Hampton, where the cattle were found.

The evidence relied upon by the state for the conviction of defendant revolved around the tracks left by the truck where the cattle were loaded at the Dry farm; the

truck found at defendant's home and owned by him, and other circumstances which will be hereafter related; and certain statements made by the defendant after his arrest.

The uncontradicted testimony was that the defendant left Barnsdall about 10 o'clock on the morning of December 30, 1941, and went to Perry, arriving there about sundown. Perry is in Noble county and a distance of about 12 miles from where the cattle were stolen, in Payne county. That the defendant passed within close proximity to the Dry pasture on that date. That he slept in his truck that night at the McKee barn, in Perry. That he left his truck there the next morning, and secured one Walt McKee to take him to Oklahoma City in his automobile. His purpose in going to Oklahoma City was to see a Mrs. Montgomery with reference to the payment of a mortgage on his farm.

Defendant testified that he returned to Perry on December 31st, and was around the city until 10:30 or 11 o'clock that night, then got his truck and drove to a side street, and slept there until the next morning, and then returned to his home in Osage county. He denied having been to the Dry farm, and denied stealing the cattle. He was corroborated by the witness Walt McKee as to his trip to Oklahoma City, his return to Perry, and of his leaving him about 10:30 or 11 o'clock the night of December 31st, on the streets of Perry. He was also corroborated by Mrs. Kenneth Page, who had a restaurant at Cleveland, Okla., as to his coming by her place of business on January 1, 1942, about 9:30 in the morning, and she testified that his truck was empty at that time.

There was no evidence of anyone seeing the defendant in Perry after he left the witness McKee about 11 o'clock on the night of December 31st, or of anyone seeing him in the city of Perry the next morning.

The state introduced a number of witnesses who testified with reference to the tracks made by the truck into which the cattle were loaded at the Dry farm, and the tires on the truck of defendant when he was arrested. Among these witnesses were several officers, and dis-interested citizens. They testified after an examination of the truck and the tires, and the plaster of paris casts that were made.

Joe Bradley, undersheriff of Payne county, testified:

"Q. State your name. A. Joe Bradley. Q. What is your occupation? A. Undersheriff of Payne county. Q. On the 2nd day of January, 1942, did you receive a call to go out west of Stillwater? A. Yes, sir. Q. Where did you go? A. 11 miles west and 3 or 4 miles south. Q. Who did you talk to and what did you do when you got out there? A. We talked to Mr. Dry and Gilbert Williams and Mr. Dry's wife. Q. What did you find? A. We found some truck tracks. Q. Did you find that some cattle had been stolen from Mr. Dry? A. Yes, sir. Q. Did you find out where the cattle had been pastured, A. Yes, sir. Q. Did you go over there? A. Yes, sir. Q. Did you make an investigation of those cattle, where the cattle were? A. Yes, sir. Q. What did you find from your investigation? A. We found where the truck had backed up to a bank and loaded some cattle. Q. On what side of the pasture was it? A. On the north side. Q. And the truck had backed into the north bank? A. Yes, sir. Q. Did you see the truck tire tracks there against the bank? A. Yes, sir. Q. Did it show what kind of tires, the number of tires on the truck? A. Yes, sir, it was a dual wheel truck and had six tires on it. Q. Four behind and two in front? A. Yes, sir. Q. Can you tell from your own knowledge what kind of weather we were having on the 31st day of December, 1941? A. It commenced drizzling rain in the evening and turned cold in the night. Q. Do you know how cold it turned? A. It was freezing along in the night. Q. It froze sometime during the night? A. Yes, sir. Q. Did you check

the imprints left there by this truck against the bank? A. Yes, sir. Q. Were there any peculiar markings about these imprints that were left there in the road? A. There was four of the tires that was smooth and there was two had pretty good treads on them. Q. The two tires that had good tread, where were they located on the truck as shown by the imprints in the road? A. One of them was on the left hand side of the dual wheel, and the other on the right, both of them was on the inside. Q. And the other four were smooth treads? A. Yes, sir. Q. Were you able to tell from the imprints there the approximate size of the truck, as to the tonnage weight? A. Just guessed at it, yes, sir, it was something like a ton— By Mr. York: Object to any guess work. By the Court: Overruled. By Mr. York: Exceptions. Q. What was your estimate? A. Something like a ton and a half or two ton truck. Q. Did you check any footprints in the pasture? A. Yes, sir. Q. Did you find the imprints that night or the next morning? A. The next morning. Q. What kind of imprints were you able to find in the pasture? A. We found a shoe with a sole on it that had a rim around it. And it had six crosses that run across there, the first small and the next longer and the next longer, and down below that there was three more the same shape. Q. Were you able to tell from this imprint as to the type of sole that made that imprint? A. It looked like a rubber looking sole. Q. Composition? A. Yes, sir. Q. Did you make any imprints of plaster of paris of any of the tire tracks out there that particular evening? A. I didn't. Lloyd Burris did. Q. Was that done the next day? A. It was done the next day, after we were called out there that night. Q. Did you make a plaster of paris mold of the shoe? A. Yes, sir, I did. Q. You did that yourself? A. Yes, sir. Q. You did that yourself. Were you ever able to locate a truck by your investigation? A. Yes, sir. Q. Whose tires were identical to the imprints made at the scene of this taking of the cattle? (Objection by defendant overruled) A. Yes, sir, I did. Q. Where did you locate that? A. It was parked in front of Mr. Courtright's home. Q. Where was that? A. It was about three miles south and three quarters

west of Barnsdall. Q. In what county was that? A. Osage. Q. I hand you what has been identified as state's exhibit 'A' which is in two pieces and ask you to tell me what that is? A. That is a print I took of the shoe track out there where the cattle was taken and we got that broke up, too thin and it broke. Q. That is the original imprint you made out there? A. Yes, sir. Q. Does this imprint, that cast show the wedge marks that you have reference to in your testimony? A. Yes, sir, it shows three of them. It doesn't show them all, but it shows three of them. Q. You made this plaster of paris mold yourself? A. Yes, sir. Q. Of the tracks found in the pasture? A. Yes, sir. Q. Gilbert Dry's pasture west of Stillwater? A. Yes, sir. (State's exhibit 'A' is admitted in evidence). Q. Did you make a plaster of paris mold of the heel? A. Yes, sir. It was all together until they broke apart. Q. I hand you state's exhibit 'B' and tell me what that is. A. That is a print of the heel of the shoe I taken. Q. That imprint was also taken in Gilbert Dry's pasture west of Stillwater? A. Yes, sir. Q. And it is the same imprint that is represented by the other two parts, being the sole part? A. Yes, sir. (State's exhibit 'B' is admitted over objection of defendant.) Q. When you went to the defendant's home in Osage county, did you take anyone with you? A. Yes, sir. Q. Who did you take? A. I taken A. W. Murray, Charlie Frank and Charlie Morris. Q. Who are those gentlemen? A. A. W. Murray is a Texas Ranger that works in Osage county, and Charlie Frank is a deputy sheriff and Charlie Morris is too. Q. Deputy sheriffs of Osage county? A. Yes, sir. Q. Did you tell them what you were up there for? A. Yes, sir. Q. And what you were looking for? A. Yes, sir. Q. Did you tell them, those three men, and describe to them the imprints made by the tires out here on Gilbert Dry's farm and show them the plaster of Paris molds made out there? A. Yes, sir. Q. What did you tell them in reference to where the tires were situated, which tire was on which wheel? (Objection sustained.) Q. You did tell them, did you? A. Yes, sir. Q. Did you go with these officers then, to Mr. Courtright's farm? A. Yes, sir. Q. Tell the court and jury how are

you able to identify that truck you saw in Mr. Courtright's yard. (Objection overruled.) A. I had the plaster of Paris prints, two of them, and then I took this plaster of Paris print and put it by the side of the tires and it corresponded with the track we had— (Objection overruled) There was four tires on those tracks that were smooth and two of them that had good treads and the ones we had taken the plaster of paris prints of. Q. The two tires that had the good prints on the truck at Barnsdall, were they identical to the imprints made by the plaster of paris molds you had? (Objection overruled.) A. Yes, sir. Q. Had there been any changes that you were able to find in relation to the tires on the truck that day there at Barnsdall and the way they were then—that the imprints showed at Stillwater? (Objection overruled.) A. Yes, sir, there had been. (Objection overruled.) A. A tire on the inside dual wheel— Q. Left or right? A. The right side, it had been taken from there and put on the front on the left side of the truck. . . . Q. Had any other change been made? (Objection overruled.) A. Yes, sir. Q. What was that? (Objection overruled.) A. One of the smooth tires, the one on the front at the time it made the print out here, had been moved to the back. Q. From which front? A. The left front wheel. Q. Moved where? A. On the back rear. Q. The right rear or left rear? A. Right rear. Q. The tire that made the good imprint on the right rear out here at Gilbert Dry's place, do you know what kind of a tire that was? A. No, sir, I didn't pay much attention. I didn't look about tires, all I was looking for was the tread. Q. Was Mr. Courtright there when you got there? A. Yes, sir, he was in the house. Q. Did he come out to see you? A. Charlie Frank went in the house and got him. Q. How long were you there before Mr. Courtright came out? A. I guess about ten minutes. Q. What were you doing in the meantime? A. Checking the truck. Q. You checked the truck for about ten minutes and Mr. Courtright never come out of the house? (Objection overruled.) A. Yes, sir, that's right. Q. Did you see Mr. Courtright before Mr. Frank brought him out? A. No, sir. Q. Did you have any conversation with him

at that time? . . . A. Yes, sir, I did. Q. What was that conversation? A. I asked him how long it had been since he hauled any cattle in that truck. Q. What was his answer? A. He said it had been three or four months since there had been any cattle hauled in it, and then he hauled some cattle for a neighbor. Q. Did he tell you what he had been doing with the truck in the meantime? A. Hauling hay. Q. Did you examine the truck up there? A. Yes, sir. Q. Was there any cattle hair in that truck? A. Yes, sir, there was. Q. What kind was it? A. Red and white. Q. Any other kind? A. Well, roan, the roan and white would be about the same. Q. In that truck body, was there any cattle manure in there? A. Yes, sir, there was. Q. Can you testify about how many distinct parts there were? A. It looked like several head of cattle had been in there. Q. Why do you say that? A. From the signs in the truck. Q. Were you able to tell the approximate age of the manure? A. I guessed it to be about eight or ten days old, the way it looked. Q. What was the date you went up there? A. On the 10th day of January. Q. That is the date you are talking about now? A. Yes, sir. Q. And it looked at that time to be eight or nine days old? A. Yes, sir. Q. I will ask you was there anything unusual about the appearance of the right rear wheel, inside rear wheel, which had been moved up to the left front? A. Yes, sir. (Objection to form of question sustained.) Q. What was the appearance of the left front wheel at the time you saw it at Barnsdall? A. Had mud rubbed on it so it wouldn't show it had been moved. (Objection and motion that answer be stricken sustained.) Q. How do you know the mud had been rubbed on there? A. It looked like someone had took mud in their hand and rubbed it on the wheel. Q. On what part of the wheel was it? A. Where it had set against another wheel, the steel part of it. If they rub up against something, it would show it had been used. Q. You say there was mud rubbed on there? A. Yes, sir. Q. Any finger prints? A. No, sir, just like you would take your hand and rub it on. Q. Did you look at the right front wheel. A. Yes, sir. Q. Was it in the same condition? A. No, sir, it was not. Q. What

condition was it in? A. It looked like the car had been drove in the mud, it was spattered on there, and there is a difference where it had been throwed on there and where it had been rubbed on. Q. Did you bring the defendant back to Stillwater on the 10th day of January? A. Yes, sir, I did. Q. Did you have any conversation with the defendant on the way back that night? A. Yes, sir. Q. From Barnsdall? A. Yes, sir. Q. What was that? A. He said he had loaded a cow in the truck. I asked him how come that manure in the truck and he said he had loaded a cow in the truck and was going to haul her off and put her in there one night and she stayed in there all night and it was bad the next day and he turned her out and didn't take her. Q. Did you go back to Barnsdall at a later date? A. Yes, sir. Q. When was that? A. The next day, the 11th. Q. What did you do when you got back up there? A. We went back and brought the truck down here. Q. Did you find any shoes up there? A. Yes, sir. Q. Were those shoes you found—did they have a sole that would make a mark identical to the plaster of Paris mold you found here in the field? (Objection sustained.) Q. You say you found a pair of shoes? A. Yes, sir. Q. Will you describe those shoes? A. Those shoes I found was just like the print I seen there in Dry's pasture. (Objection sustained.) Q. Describe it. A. They were work shoes, looked to be about 10 or 11 size with that sole on them like I seen in the prints out there. Q. Describe the kind of a sole you found on the shoes at Carl Courtright's home. A. In the center of this shoe it had a ring that run around and it had those three bars here in a space between there and three more down below. Q. Tell the court where and how you got those shoes? A. Carl's mother had them on that time, and I says, 'I would like to see the bottom of those shoes' and she held it up and I says, 'Mrs. Courtright I would like to take those shoes with me if you have another pair to put on' and she says— (Objection sustained.) A. Well, I told her I would like to take them with me. Q. And you did take them? A. Yes, sir. Q. I hand you state's exhibit 'C' and tell the jury what those are? A. Those are the shoes I got at

Mrs. Courtright's home. Q. Those are the same shoes you found in Mr. Courtright's home at Barnsdall, Oklahoma? A. Yes, sir. Q. On January 11, 1942? A. Yes, sir. (Exhibit 'C' is offered in evidence.) Q. By Mr. York: You had to take them off of Mrs. Courtright? A. No, sir, I didn't take them off. Q. You just told her you wanted them? A. Yes, sir. (Objection on ground that they were not shown to be defendant's shoes overruled, and exhibit admitted.) Q. Point out to the jury the ridges you spoke of a while ago. A. Those right there. There is one bar here, and here is three, and a space between and three more down there. Q. Right in there? A. Yes, sir, right there. Q. This plaster of Paris mold, take that and show the ridges? A. Right there is three, right there. Q. Does the ring show on there? A. It doesn't. It has been broke off. It shows a little on that edge of it right there."

The testimony of this witness was corroborated by Lloyd Burris, a deputy sheriff, and E. G. Schroeder, the sheriff of Payne county; by W. C. Franks, deputy sheriff of Osage county; A. W. Murray, brand inspector for the Texas-Southwestern Cattle Raisers Association in Osage county; and Charles Morris, deputy sheriff, of Barnsdall, Okla.; and by Ray Henderson, Cliff Williams and Ralph Leonard, who all lived near the Dry farm and who examined the tracks made by the truck where the cattle were loaded, and examined the tires on defendant's truck. It is unnecessary to give further details of the testimony of these witnesses. Each of them corroborated some parts of the testimony of the witness Joe Bradley.

According to the testimony of the sheriff of Osage county, defendant at first denied that the witness McKee took him to Oklahoma City, and later changed his story, and admitted that he did.

The defendant's mother testified that her son had given her the shoes referred to in the foregoing testimony,

and that she had them in her possession on the night of December 31, 1941, and that the defendant did not have them at that time.

We have carefully read the cases cited by the defendant and by the state in support of their respective contentions.

The defendant cites the following Oklahoma cases: De Bose v. State, 18 Okla. Cr. 549, 197 P. 176; Stuart v. State, 35 Okla. Cr. 103, 249 P. 159; Davis v. State, 18 Okla. Cr. 112, 193 P. 745; Starr v. State, 63 Okla. Cr. 302, 74 P. 2d 1174; Hamilton v. State, 25 Okla. Cr. 233, 219 P. 951; Nash v. State, 8 Okla. Cr. 1, 126 P. 260; Knight v. State, 73 Okla. Cr. 107, 118 P. 2d 255; Cook v. State, 71 Okla. Cr. 65, 108 P. 2d 184; Hicks v. State, 70 Okla. Cr. 284, 106 P. 2d 136; Plumleg v. State, 69 Okla. Cr. 65, 100 P. 2d 299.

The state cites: Cheeves v. State, 18 Okla. Cr. 480, 196 P. 726; Webb v. State, 54 Okla. Cr. 150, 16 P. 2d 261; Fuller v. State, 70 Okla. Cr. 408, 106 P. 2d 832; West v. State, 64 Okla. Cr. 208, 78 P. 2d 724; Rucker v. State, 64 Okla. Cr. 259, 79 P. 2d 629; McCormick v. State, 64 Okla. Cr. 350, 80 P. 2d 598; Gourley v. State, 49 Okla. Cr. 24, 292 P. 873; Houston v. State, 63 Okla. Cr. 49, 72 P. 2d 526; Simpson v. State, 52 Okla. Cr. 311, 4 P. 2d 126.

It is often difficult to prove the guilt of a defendant in cases of this character, except by the use of circumstantial evidence; and it is, therefore, the law that this evidence must be such that every logical inference of guilt clearly appears, and that it must exclude any reasonable hypothesis except the guilt of the accused; yet each of these cases to a great extent depends upon the facts and circumstances of the individual case. West v. State, 64 Okla.

Cr. 208, 78 P. 2d 724; Rucker v. State, 64 Okla. Cr. 259, 79 P. 2d 629; McCormick v. State, 64 Okla. Cr. 350, 80 P. 2d 598; Gourley v. State, 49 Okla. Cr. 24, 292 P. 873; Houston v. State, 63 Okla. Cr. 49, 72 P. 2d 526; Tillery v. State, 23 Okla. Cr. 226, 214 P. 198; Simpson v. State, 52 Okla. Cr. 311, 4 P. 2d 126.

It has been the universal holding of this court that a verdict of guilty will not be set aside on the grounds of the insufficiency of the evidence where there is substantial evidence tending to support the verdict. The weight of the testimony and the credibility of the witnesses is for the determination of the jury.

In the instant case the testimony was largely circumstantial. There was a conflict between the testimony of the defendant and some of these circumstances. The jury was in a much better position, after hearing and seeing the witnesses, to determine this issue, than is this appellate court. We are not able to say that the evidence here produced was insufficient to sustain the judgment and sentence. The jury had the right to believe the testimony of the defendant and find him not guilty. It also had the right to find that the circumstances surrounding this transaction, the statements of defendant, and the physical facts were such as to convince them of the guilt of the defendant, and we do not find there was error in so finding.

It is next contended that the court admitted incompetent evidence over the objection of the defendant.

In support of this contention, two Oklahoma cases are principally relied upon. The first is that of Stuart v. State, supra. This was a murder case, based upon circumstantial evidence, and was reversed. It was there said [35 Okla. Cr. 103, 249 P. 160]:

"Passing for further consideration the competency and materiality of the evidence, we believe that the evidence introduced was sufficient on the facts to carry the case to the jury and to sustain the verdict."

A number of errors were assigned in that case, and the case was reversed by reason of the introduction of incompetent and immaterial testimony, and on erroneous instructions given to the jury. One of the witnesses was permitted to testify that, "Certain footprints near the body were made by the same shoe that made tracks near defendant's residence." The court said:

"Unless the matter is one calling for expert testimony, it is the province of a witness to state facts, not conclusions. The admission of conclusions, before the witness has shown his qualifications in making observations or tests, is error."

The testimony in the instant case cannot be said to come within the category of being conclusions. It was based upon experiments and observations from existing facts. The court in the concluding part of the opinion in the Stuart Case, supra, said:

"In considering the record presented, none of the errors pointed out, standing alone, except possibly the error in admitting the overture to procure false testimony by Dewitt Stuart, would require a reversal. The various errors taken all together are such that we find the defendant did not have that fair trial which the law guarantees."

"The case is, therefore, reversed and remanded."

In the case of De Bose v. State, supra, cited by defendant, the defendant was charged with arson and convicted. The case was based wholly upon circumstantial evidence, and was reversed. In the trial of the case, certain evidence was admitted with reference to certain

tracks of some person, and the tracks of a horse. The court did not hold that this evidence was incompetent and inadmissible, but the case was reversed by reason of the court's refusal to admit competent and material evidence, and that all the facts proved did not justify the finding of the defendant guilty, under the law. The facts in the instant case do not so justify.

The above contention is based largely upon the evidence of the witness Joe Bradley, and the testimony of Sheriff Schroeder, and Deputy Lloyd Burris, with reference to an examination and comparison of the tracks found at the place the cattle were stolen, and the tires on the truck of defendant. We have carefully examined this testimony, and are of the opinion that the witnesses were not testifying to conclusions, but to facts from their observations, made at the time of their examination. These witnesses pointed out the peculiarities on the tires of the trucks, and the imprints made at the place where the cattle were loaded and stolen. Rucker v. State, supra; West v. State, supra.

For the reasons above stated, the judgment of the district court of Payne county is affirmed.

JONES, P. J., concurs. DOYLE, J., not participating.